933 P.2d 48

STATE of Hawai'i, Plaintiff–Appellee,

v.

Jesse James Arruda BATES,
Defendant–Appellant.

No. 18121.

Supreme Court of Hawai'i.

Jan. 31, 1997.

Michael Jay Green and David J. Gierlach, on the briefs, Honolulu, for defendant-appellant.

Mark R. Simonds, Deputy Prosecuting Attorney, on the briefs, Wailuku, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

NAKAYAMA, Justice.

Following a jury trial, Jesse James Arruda Bates (defendant) was convicted on February 10, 1994 of one count of racketeering, pursuant to Hawai'i Revised Statutes (HRS) § 842–2(3) (1993), and one count of extortion

in the first degree, pursuant to HRS § 707–765(1)(b) (1993). On appeal he raises four issues for consideration: (1) the 686 inaudible entries in the trial transcript prevent appellate counsel from engaging in a meaningful review of the record in order to determine error, therefore requiring a new trial; (2) the trial court erred in holding that HRS § 842–2(3), and specifically the term "associated with any enterprise," was not unconstitutionally vague; (3) the trial court erred in permitting the introduction of certain evidence against the defendant; and (4) the prosecutor engaged in prosecutorial misconduct during closing argument. Upon review of the record, statutes, and applicable case law, we affirm the defendant's convictions on both counts.

## I. Background

On May 21, 1993, the defendant, along with Dennis Satoshi Yoshida (Yoshida) and Kenneth L. Oliveira, Jr. (Oliveira) (neither of whom is subject to this appeal), were indicted in a nine-count indictment by the Maui grand jury. The defendant was charged with criminal conspiracy (Count Seven) (HRS § 705–520 (1993)), racketeering (Count Eight) (HRS § 842–2(3)), and extortion in the first degree (Count Nine) (HRS § 707–765(1)(b)). A jury convicted the defendant of racketeering and extortion in the first degree, but acquitted him of criminal conspiracy.

Prior to trial, on July 27, 1993, Oliveira moved to dismiss the indictment on the ground that the term "associated with any enterprise," as set forth in HRS § 842–2(3), was unconstitutionally vague. The defendant subsequently joined in that motion. On August 16, 1993, the trial court denied the motion as to both defendants. However, the trial court ordered the prosecution to file a bill of particulars specifying each defendant's role in the enterprise as charged under the racketeering count. The bill of particulars was filed on August 23, 1993.

At trial, the prosecution offered evidence that Yoshida was a bookmaker who accepted wagers from Curtis Fukushima (Fukushima) in an elaborate sports betting operation. Fukushima testified that he initially became involved with Yoshida in 1990 through sports gambling. He placed bets with a "runner" associated with Yoshida, and his wagering increased to the point that he was betting $2,000 a game. This relationship continued through March 1991, at which time his bets averaged $5,000 to $20,000 per week. By June 1991, Fukushima owed Yoshida $32,000 and began making regular payments to him regarding this debt. By April 1992, he reduced his debt to $22,000 and agreed to make monthly payments of $300 to Yoshida. However, due to employment problems, he was unable to continue making payments. Fukushima testified that in May 1992, Yoshida told him that, if payments were not made immediately, "[t]wo guys from Honolulu would come" and "take care" of him. He resumed the payments, sometimes making substantial payments, but eventually stopped.

In August or September 1992, Yoshida carried through with the threat. He, Oliveira, and the defendant appeared at Fukushima's place of employment. Yoshida uttered only one word to him, "sixteen-eight," representing $16,800, the balance then owed to him. The defendant told Fukushima that he needed to pay off the entire debt by the end of September 1992 and threatened, "[D]on't screw with us." Fukushima resumed his monthly payments of $300 a month until January of 1993, when he was again unable to continue. He stated that on March 27, 1993, the defendant and Oliveira appeared at his home to inquire about his payments. The defendant introduced himself as "Jessie," and told Fukushima that, every time Fukushima won, "they paid," and instructed him "to make arrangements" or "to do something." The defendant also ordered Fukushima to call Yoshida, which he did, but was unable to reach him. The men informed Fukushima that he had until April to pay off the debt or make some other kind of arrangement. Fukushima stated that, after they left, he was "scared" because "he didn't know what they were going to do."

In April 1993, the Maui Police Department (MPD) contacted Fukushima after surveillance of Yoshida, already underway by the department's Vice Gambling Unit, placed him at Fukushima's residence. Fukushima

agreed to cooperate with the police in their investigation of Yoshida by taping a telephone conversation. On April 16, 1993, Fukushima contacted Yoshida in order to make payment arrangements, agreeing to deliver $500 (provided by the MPD). This telephone conversation was recorded. In exchange for his further assistance, the MPD granted Fukushima Victim Witness protection. A later meeting between the two men was also recorded by Fukushima, and on May 20, 1993, a second payment was made. A search warrant was executed on Yoshida's apartment, and the $500 was recovered. Fukushima testified before the grand jury and left Maui the next day.

The defendant testified on his own behalf and initially denied having any knowledge of or relationship to Yoshida's gambling activity; specifically, the defendant denied acting as a collection enforcer for Yoshida. However, he later admitted to visiting Fukushima at his workplace accompanied by Yoshida and Oliveira, but otherwise denied saying anything to Fukushima or threatening him. The defendant also stated that shortly after this visit, he and Oliveira went to Fukushima's home, testifying:

> I said, "My name is Jesse," and I shaked his hand, you know, and he says, "Oh, I no can pay." I said, "What, what you say?" He say, "I cannot pay." I says, "Hey, call up Dash. Talk to Dash about it. Go see him, because he like know when you can pay him."
> Then Curtis told me, "Oh what I gotta pay you guys?" I said, "You don't have to pay us nothing. I'm just comin' here as a friend to see you. When you won, you took your money. Now that you lost, you gotta pay your debt."

The defendant claimed he visited Fukushima only to gain loyalty from Yoshida because he wanted to hire him for his trucking business. On cross examination, the defendant later stated that "I ain't came here for collect debts for Dennis Yoshida or anybody else."

## II. *Discussion*

### A. *Inaudible Entries in Transcripts*

In his first assignment of error, the defendant argues that the trial transcripts are incomplete because of 686 inaudible entries,[1] thereby preventing counsel and this court from engaging in any meaningful review of the trial. He urges, therefore, that a new trial is required.

The defendant's trial was not transcribed by a live court reporter, but rather, was videotaped and, subsequent to the trial, the proceedings were transcribed by an official court reporter. The defendant maintains that because appellate counsel is different from his trial counsel, new counsel "cannot know whether error was committed during the 'inaudible' portions of the trial, cannot know the basis for the objections made, and cannot determine if certain 'inaudible' questions were objectionable."

After briefing was completed in this case, the Intermediate Court of Appeals (ICA) decided *State v. Ganotisi,* 79 Hawai'i 342, 902 P.2d 977 (App.1995), which addressed an analogous issue. In that case, the defendant was prosecuted for various counts of sexual assault, terroristic threatening, kidnapping, and abuse of family and household member arising out of acts perpetrated against his stepdaughter. The trial was also videotaped and later transcribed by an official court reporter. The trial transcript contained 368 notations by the court reporter of "no audible responses," "indiscernible words," or "indiscernible whisperings or conversation." *Id.* at 343, 902 P.2d at 978.

The defendant maintained on appeal that he was prejudiced by the inaudible entries because his appellate counsel was unable to accurately review the trial proceedings to determine whether prejudicial error occurred.[2] The defendant offered two exam-

---

1. 81 of the 686 inaudible entries occurred during opening and closing arguments. Thus, apart from claims of prosecutorial misconduct during closing argument, these inaudible entries can be disregarded because the remarks of the attorneys do not constitute evidence in the case.

2. There was no indication in *Ganotisi* that the defendant's trial and appellate counsel were different, as in the present case.

ples of how he was prejudiced by these omissions.

The ICA noted that, "[a]lthough an indigent criminal defendant is entitled to be provided with a record of sufficient completeness, to permit proper consideration of the defendant's claims on appeal, a full verbatim transcript of the trial proceedings is not automatically required, especially if other alternatives are available to assure the defendant a fair appellate review." *Id.* (citations and internal quotations omitted). The court further observed:

> Moreover, the general rule is that where the transcripts of a defendant's trial are incomplete because they omit portions of the trial proceedings, such omissions do not mandate reversal unless they specifically prejudice the defendant's appeal. *See, e.g., United States v. Malady,* 960 F.2d 57, 59 (8th Cir.1992) (lack of complete transcript does not necessarily require reversal; to obtain reversal, defendant must show that the missing part of the transcript specifically prejudices the appeal); *United States v. Antoine,* 906 F.2d 1379, 1381 (9th Cir.1990), *cert. denied, Antoine v. United States,* 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 407 (1990) (even if there were omissions in the transcripts, appellant cannot prevail without a showing of specific prejudice); *United States v. Gallo,* 763 F.2d 1504, 1530 (6th Cir.1985), *cert. denied by Gallo v. United States,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 and *Graewe v. United States,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986) (court reporter's failure to fully record bench conferences not per se error requiring reversal); *United States v. Robinson,* 459 F.2d 1164, 1171 (D.C.Cir.1972) (conviction would not be reversed for transcript's omissions of eleven bench conference proceedings and other inaudible or garbled proceedings, where record was sufficient to permit full and considered appraisal on appeal); *Edwards v. United States,* 374 F.2d 24, 26 (10th Cir.1966), *cert. denied,* 389 U.S. 850, 88 S.Ct. 48, 19 L.Ed.2d 120 (1967) (failure

of court reporter to record a sidebar conference not prejudicial error per se).

*Id.*

The ICA reviewed the two instances in the trial transcript where the defendant alleged he was specifically prejudiced by the inaudible entries, and, in one instance, was able to glean from the surrounding context the relevant objection made by defendant's counsel, as well as the court's ruling. In doing so, the court concluded that the defendant was not prejudiced "by either the substantive resolution of [the defendant's] objection at trial or the omission in the transcript of the proceedings." *Id.* at 345, 902 P.2d at 980. As to the second instance where the defendant claimed prejudice, the ICA reviewed the actual videotape of the trial and was successful in deciphering some of the inaudible entries in the trial transcript. The court held that the "defendant was not prejudiced by the quality of the transcripts of his trial so as to deny him his due process right to a meaningful appeal." *Id.* at 346, 902 P.2d at 981.

In the present case, our task is made more difficult because the defendant only cited one example (comprised of twenty-one inaudible entries) of the 686 present where he alleges he was specifically prejudiced. As to the remainder of the entries, the defendant claims that appellate counsel is simply unable to complete a meaningful review in order to ascertain whether error exists. To the extent that the *Ganotisi* court was ultimately successful in reviewing the two examples of specific prejudice to the defendant, this court is unable to do so. Therefore, because this remedy is simply unavailable, nor is this court inclined to peruse the nine days of trial transcripts hoping to glean the surrounding context of the inaudible entries, *Ganotisi* is not outcome dispositive. We are compelled to look to federal decisions, which have considered the issue of incomplete trial transcripts, for guidance.

The federal courts have developed two standards concerning the failure to comply with the Court Reporter Act, (Act) 28 U.S.C. § 753 (1970)[3], and omission of portions of a trial transcript which are not reviewable for

---

**3.** The Court Reporter Act, 28 U.S.C. § 753, provides in relevant part that a court reporter "shall

record verbatim ... all proceedings in criminal cases had in open court...." *Id.* at § 753(b).

purposes of appellate review. The first approach holds that failure to comply with the Act is not error per se and does not require reversal absent a specific showing of prejudice—i.e., a defendant must show that the failure to record and preserve the specific portion of the trial proceedings visits a hardship on him or her and prejudices his or her appeal. *See United States v. Malady,* 960 F.2d 57, 59 (8th Cir.1992); *United States v. Antoine,* 906 F.2d 1379, 1381 (9th Cir.), *cert. denied,* 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 407 (1990); *United States v. Kenney,* 911 F.2d 315, 318 (9th Cir.1990); *United States v. Gallo,* 763 F.2d 1504, 1530–31 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986); *United States v. Alfonso,* 552 F.2d 605, 620 (5th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977); *Commercial Credit Equipment Corp. v. L & A Contracting Co.,* 549 F.2d 979, 980 (5th Cir.), *reh'g denied,* 553 F.2d 100 (1977); *United States v. Long,* 419 F.2d 91, 94 (5th Cir.1969); *Addison v. United States,* 317 F.2d 808, 811 (5th Cir.1963), *cert. denied,* 376 U.S. 966, 84 S.Ct. 1121, 11 L.Ed.2d 984 (1964); *Strauss v. United States,* 311 F.2d 926, 933 (5th Cir.), *cert. denied,* 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963).[4] At least one state court has adopted this approach. *See State v. Dam,* 116 Or.App. 210, 840 P.2d 1317, 1319 (1992) (where substantial portions of the record of oral proceedings in the trial court were inaudible, court held "despite the absence of a record to look at, an appellant must persuade the reviewing court that what is missing would be a prima facie indication of an error or would demonstrate unfairness in the trial." (citation omitted) (emphasis deleted)). The ICA appears to have adopted this standard in *Ganotisi.*

Under the second approach, developed by the Fifth Circuit Court of Appeals in *United States v. Selva,* 559 F.2d 1303 (5th Cir.1977), a distinction is made between cases where trial and appellate counsel are the same, on the one hand, and where there is different counsel on appeal, on the other. Where trial and appellate counsel are the same, *Selva* follows the first approach. However, where appellate counsel is different from trial counsel, *Selva* applies a less exacting standard; a defendant need only show the absence of "a substantial and significant portion of the record" to warrant reversal. *Id.* ·at 1306. *See also United States v. Gregory,* 472 F.2d 484, 486 (5th Cir.1973) (dicta); *United States v. Upshaw,* 448 F.2d 1218, 1223 (5th Cir.1971), *cert. denied,* 405 U.S. 934, 92 S.Ct. 970, 30 L.Ed.2d 810 (1972).[5]

In *Gallo, supra,* the Sixth Circuit Court of Appeals criticized this approach based on the distinction concerning different appellate counsel, stating, "[t]o apply a different standard as a matter of course may invite counsel to plant the seeds of reversible error during the course of trial, and permit a resourceful defendant to reap the benefit by utilizing a different counsel on appeal." *Id.* at 1531 n. 40; *see also United States v. Smith,* 591 F.2d 1105, 1109 n. 1 (5th Cir.1979) ("This anomalous [*Selva* ] rule seems to invite the manipulation of appellate causes to achieve unmerited reversals.").

---

4. The rule established by this line of cases is expressed by *Addison, supra,* where the appellants claimed that the failure of the court reporter to record the arguments of counsel was reversible error.

In their appeal in this case, although appellants were represented in the trial by six lawyers, one of whom is still representing one of the appellants in this court, the record is silent as to any objection made or any motion of any kind filed with respect to any alleged impropriety during the course of final arguments of counsel. Nor have the appellants in their original brief filed in this case attempted to state that any inflammatory or other improper comments were made by counsel during their summations. Obviously, even though a failure of the court to report the arguments of counsel were an error per se, such error would not be available to appellants to work a reversal without a showing that it was prejudicial error.... Without even the contention being made as to language used or other conduct of counsel that goes beyond the permitted range of oral argument, no effort is made to show that such failure prejudiced appellants.

*Id.* at 811.

5. Texas courts in recent years appear to have adopted the *Selva* approach. *See Dunn v. State,* 733 S.W.2d 212, 216 (Tex.Crim.App.1987), *cert. denied,* 506 U.S. 834, 113 S.Ct. 105, 121 L.Ed.2d 63 (1992); *Austell v. State,* 638 S.W.2d 888, 890 (Tex.Crim.App.1982); *Gamble v. State,* 590 S.W.2d 507, 509 (Tex.Crim.App.1979).

■ In light of the ICA's decision in *Ganotisi*, which seemingly adopts the first approach, this court will adhere to the following rule: where the transcripts of a defendant's trial are incomplete because they omit portions of the trial proceedings, such omissions do not mandate reversal unless the defendant can demonstrate specific prejudice. This standard still does not address the issue presented by this appeal, namely, whether the defendant or his counsel can be expected to demonstrate specific prejudice where the trial transcript is replete with "inaudible responses," thereby arguably preventing any meaningful review.

This court has previously alluded to the answer to this query in *State v. Puaoi*, 78 Hawai'i 185, 891 P.2d 272 (1995), suggesting that a defendant has a duty to supplement the record pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(c), where no transcript was available from the trial.

In *Puaoi*, following the defendant's conviction for abuse of a family and household member, the defendant filed a notice of appeal and requested a transcript of the trial proceedings. An official court reporter signed an affidavit stating that no trial transcript could be prepared because the audiotape that had been used to record the trial was blank. Thereafter, both parties filed a "Stipulation for Dismissal of Appeal and Motion for Order to Remand for New Trial" with this court. This court refused to approve the stipulation and denied the motion because the parties "failed to show either (1) compliance with the requirements of Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(c) (1984) or (2) any error committed by the trial court[.]" *Id.* at 187, 891 P.2d at 274. We stated:

> This court's order denying the parties' motion to remand for new trial is consistent with the rule followed in other courts proceeding under Federal Rules of Appellate Procedure (FRAP) Rule 10(c), that is, a party is not entitled to a new trial because of the absence of . . . the record, without first having attempted to supplement the record by proceeding under Rule 10(c).

*Id.* at 187 n. 2, 891 P.2d at 274 n. 2. (citation and internal quotations omitted). We also noted that

> [t]he prosecution, the court, and the defendant have an obligation and duty under HRAP Rule 10(c) to ensure that the record of the evidence and proceedings at trial is complete and accurate.

HRAP Rule 10(c) was adopted and promulgated by this court in 1984 and is functionally equivalent to FRAP Rule 10(c), governing the supplementation of the record on appeal. "In both criminal and civil appeals, the appellant bears the burden of presenting [the appellate] court with a record sufficient to show that error occurred at trial." *Cole v. United States*, 478 A.2d 277, 283 (D.C.App.1984) (citations omitted); *see also State v. Goers*, 61 Haw. 198, 600 P.2d 1142 (1979) (where appellant fails to carry the burden of producing the proper transcripts to challenge a finding or conclusion that he or she claims is unsupported by evidence, the finding or conclusion will normally remain undisturbed by the appellate court).

*Id.* at 189, 891 P.2d at 276. *See also State v. Bigelow*, 2 Haw.App. 654, 655, 638 P.2d 873, 875 (1982) (although decided prior to the 1984 amendments of HRAP, specifically the creation of HRAP Rules 10(c) and 10(e), the ICA noted that a defendant has a duty to correct the record once it is docketed).

■ In light of the rule previously set forth that omissions in trial transcripts do not mandate reversal unless the defendant can demonstrate specific prejudice, and, in accordance with *Puaoi*, we add the following caveat: a defendant has a duty to reconstruct, modify, or supplement the missing portions of the record, and a failure to make a reasonable attempt to do so precludes him or her from alleging reversible error. *See e.g.*, Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure: Jurisdiction* § 3956 at 387 (1977) ("where no report of the evidence or proceedings at the hearing or trial is available, [(FRAP)] Rule 10(c) provides that 'the appellant may prepare a statement from the best available means, including his recollection.' ").

A Rule 10(c) statement is appropriate whenever the reporter, for whatever reason, does not in fact record the proceedings in question, or if the reporter's notes or recording devices have been lost or destroyed.

*But a party is not entitled to a new trial, because of the absence of a vital portion of the record, without first having attempted to supplement the record by proceeding under Rule 10(c).*

*Id.* at 387 n. 3 (citations omitted) (emphasis added).[6]

As previously noted in *Puaoi,* HRAP Rules 10(c) and (e), like their federal counterparts, FRAP 10(c) and (e), provide a criminal defendant with several remedies to correct or modify inaudible portions of the trial transcript. These rules provide, respectively:

**(c) Statement of the Evidence or Proceedings When No Report Made or When Transcript Unavailable.** This rule only applies where there is no report of the evidence or proceedings at a hearing or trial due to no fault of appellant. This rule encompasses situations such as where the reporter refuses, becomes unable, or fails to transcribe all or any portion of the evidence or oral proceedings. In such situations the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection. The statement shall be served on the appellee, who may serve objections or propose amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the

---

**6.** This principle has been followed by various federal and state courts. *See Kenney,* 911 F.2d at 318 (where court reporter lost portion of the trial transcript, each party prepared a statement regarding that portion lost, which, in turn, was approved by the trial court pursuant to FRAP 10(c)); *Malady,* 960 F.2d at 59 ("In addition, Malady did not attempt to reconstruct the missing testimony under Federal Rule of Appellate Procedure 10(c) or by any other method."); *United States v. LaSpesa,* 956 F.2d 1027, 1035 (11th Cir.1992) (although five transcript portions of the trial record were omitted from the record, the trial court was able to reconstruct the record in accordance with Federal Rules of Appellate Procedure 10(e)); *Commercial Credit Equip. Corp.,* 549 F.2d at 980 (court reporter failed to transcribe closing arguments; both parties filed post-trial affidavits concerning the contents of closing arguments and hearing was held with court reporter present and both parties testified about the nonrecorded portions of the record); *United States v. Robinson,* 459 F.2d 1164, 1171 n. 18 (D.C.Cir.1972) ("Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions rise. A statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judge's minutes taken during trial or on the court reporter's untranscribed notes ... might all be adequate substitutes, equally as good as a transcript.") (quoting *Draper v. Washington,* 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963)); *Addison v. United States,* 317 F.2d 808, 811 (5th Cir.1963), *cert. denied,* 376 U.S. 905, 84 S.Ct. 1121, 11 L.Ed.2d 984 (1964) (after being served with defendant's brief criticizing failure of court reporter to record closing arguments, the prosecution moved the trial court for a hearing on a motion to supplement the record in an effort to show what

had actually transpired; the court stated, "[i]t is appropriate, however, to call attention to the fact that unless the record is supplemented, there is nothing to support appellants' contention that the reporter failed to comply with [the Court Reporter's] statute [28 U.S.C. § 753(b)]...."); *Strauss v. United States,* 311 F.2d 926, 933 (5th Cir.), *cert. denied,* 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963) (where sidebar conferences were not recorded on fifteen occasions, court stated, "No effort has been made to reconstruct the substance of these conferences for submission on supplemental record. Furthermore, no specific error or prejudice resulting therefrom is called to our attention. This is the very least that would be required...."); *Smith v. Custom Micro, Inc.,* 311 Or. 375, 811 P.2d 1371, 1372 (1991), *cert. denied,* 508 U.S. 976, 113 S.Ct. 2972, 125 L.Ed.2d 670 (1993) (after it was discovered that the audio record of trial had been destroyed, court held that "[t]he appellant ... must show due diligence in attempting to find and supply a record for the purposes of appeal ... "); *Perez v. State,* 824 S.W.2d 565, 567 (Tex.Crim.App.1992) ("The trial court and the parties in the instant case attempted in good faith to make substitutions for the missing portions and for the disputed sections of the record."); *Summerford v. State,* 627 S.W.2d 468, 471 (Tex.App.1981) (where complete transcript of trial was missing, the court held "[s]ince it was within appellant's power to effectively fill the gap in the record, he should not be heard to complain of that gap."); *State v. Johnson,* 64 Wash.2d 613, 393 P.2d 284 (1964) (failure to supply indigent defendant with necessary transcript and statement of facts at county expense did not establish denial of constitutional rights in preparation of appeal, where defendant did not point out in what respect transcript and statement were incomplete and failed to request any additions).

court or agency appealed from for settlement and approval and as settled and approved shall be included by the clerk of the court or agency appealed from in the record on appeal.

. . . .

**(e) Correction or Modification of Record.**

(1) If any differences arise as to whether the record truly discloses what occurred in the court or agency appealed from, the differences shall be submitted to and settled by that court or agency and the record made to conform to the truth.

(2) If anything material to any party is omitted from the record by error or accident or is misstated therein, corrections or modifications may be made as follows:

(A) by the stipulation of the parties; or

(B) by the court or agency appealed from, either before or after the record is transmitted; or

(C) by direction of the appellate court before which the case is pending, on proper suggestion or its own initiative. If necessary, the appellate court may direct that a new supplemental record be certified and transmitted.

(3) All other questions as to the form and contents of the record shall be presented to the appellate court before whom the case is pending.

■ A review of the record demonstrates that, despite these availing remedies, the defendant made no attempt to reconstruct the record pursuant to HRAP 10(c) or correct or modify the record pursuant to HRAP 10(e). In fact, the defendant made no effort whatsoever, either before the trial court or this court, after an appeal was taken, to otherwise attempt to cure the inaudible entries. In contrast, the prosecution filed with this court a "Motion to Remand and Supplement Record on Appeal," which was granted by order dated May 17, 1995. The prosecution supplemented the record with the actual videotapes of the trial proceeding. The prosecution also supplemented several of the inaudible entries in the trial transcript after reviewing the videotapes.

Accordingly, we hold that because the defendant failed to make any effort or attempt to reconstruct, modify, or supplement the record, *see Puaoi, supra,* and, in conjunction with the rule that the defendant must demonstrate specific prejudice by reason of inaudible entries in a trial transcript, the defendant has failed to demonstrate specific prejudice and is not entitled to a new trial. Therefore, this assignment of error is overruled.

**B.** *Constitutionality of HRS § 842– 2(3), the Racketeering Statute*

In his second assignment of error, the defendant argues that HRS § 842–2(3), the racketeering statute, is unconstitutionally void for vagueness. This statute provides in relevant part:

**§ 842–2 Ownership or operation of business by certain persons prohibited.** It shall be unlawful:

. . . .

(3) For any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity or collection of an unlawful debt.

The defendant argues that the term "associated with any enterprise" under subsection (3) is unconstitutionally vague "because one can only guess at its meaning and application." He posits:

Is a child who accompanies one collecting an unlawful debt "associated with" that collector? Is an attorney who advises the holder of an illegal debt "associated with" the holder? Is a friend or relative who discusses the collection of an unlawful debt with one who later seeks to collect that debt "associated with" the collector? Is the lawyer who drafts articles of incorporation or by-laws for a corporation that later seeks to collect an unlawful debt "associated with" that company, or, the attorney who files a civil complaint seeking repayment of what is ultimately determined to be an unlawful debt—is he or she "associated with" the enterprise?

This is a case of first impression because there has not been a previous challenge to

the constitutionality of HRS § 842–2(3) or any aspect of the statute.[7]

### 1. Elements of the Offense

■ In order to determine the constitutionality of a statute, it is first useful to define the elements of a HRS § 842–2(3) claim. The prosecution was required to prove beyond a reasonable doubt the following four material elements: (1) the existence of an enterprise; (2) the defendant was employed by or associated with the enterprise; (3) the defendant participated in the conduct of the affairs of the enterprise through racketeering activity or collection of an unlawful debt; (4) the defendant did so intentionally, knowingly or recklessly. Cf. Steco, Inc. v. S. & T. Mfg., Inc., 772 F.Supp. 1495, 1497–98 (E.D.Pa.1991) (citing Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1165 (3d Cir. 1989)).

### 2. Standard of Review

■ When confronted with a constitutional challenge of a penal statute on the grounds of vagueness or overbreadth, we apply a number of principles on appeal. First,

> [t]he constitutionality of a statute is a question of law which is reviewable under the right/wrong standard. Additionally, where it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest and unmistakable.
>
> . . . .
>
> Second, we construe penal statutes narrowly, considering them in light of precedent, legislative history, and common sense. . . .
>
> Third, where possible, we will read a penal statute in such a manner as to preserve its constitutionality.

To accord a constitutional interpretation of a provision of broad or apparent unrestricted scope, courts will strive to focus the scope of the provision to a narrow and more restricted construction.

> Provisions of a penal statute will be accorded a limited and reasonable interpretation under this doctrine in order to preserve its overall purpose and to avoid absurd results.

Put differently, a statute will not be held unconstitutional by reason of uncertainty if any sensible construction embracing the legislative purpose may be given it. Mere difficulty in ascertaining its meaning, or the fact that it is susceptible to interpretation will not render it nugatory. . . .

State v. Gaylord, 78 Haw. 127, 137–38, 890 P.2d 1167, 1177–78 (1995) (quoting State v. Lee, 75 Haw. 80, 90–91, 856 P.2d 1246, 1253 (1993) and State v. Taylor, 49 Haw. 624, 634–35, 425 P.2d 1014, 1021 (1967)) (other citations, internal quotation marks, ellipsis points and brackets omitted).

### 3. Vagueness

To date, this court has treated claims that a criminal statute is unconstitutionally vague as essentially facial attacks, subject to the following standard:

> Due process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudicating guilt, or the statute is void for vagueness. Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.

This standard is essentially indistinguishable from the applicable standard under federal law. Thus we have so far not departed from the federal constitutional law in the area of void for vagueness challenges to criminal statutes.

Under the applicable federal law, a criminal statute is void for vagueness unless it:

---

7. In State v. Ontai, 84 Hawai'i 56, 929 P.2d 69 (1996), we construed the definition of the word "enterprise" as used in HRS § 842–2, although not in the context of a constitutional challenge to the statute.

1) gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he or she may act accordingly, and 2) provides explicit standards for those who apply the statute, in order to avoid arbitrary and discriminatory enforcement and the delegation of basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.

*Id.* at 138, 890 P.2d at 1178 (quoting *State v. Tripp,* 71 Haw. 479, 482, 795 P.2d 280, 282 (1990) and *Lee,* 75 Haw. at 92–93, 856 P.2d at 1254) (other citations, internal quotation marks, ellipsis points and brackets omitted). Under the due process vagueness doctrine as construed by federal courts:

> The relevant inquiry is whether the statute is so vague that a person could not reasonably understand that the contemplated conduct, as charged in the Indictment, would be proscribed by the statute ... [and][i]n determining the sufficiency of the notice a statute must, of necessity, be examined in the light of the conduct with which a defendant is charged.

*United States v. Paccione,* 738 F.Supp. 691, 698 (S.D.N.Y.1990) (quoting *United States v. Boffa,* 513 F.Supp. 444, 461 (D.Delaware 1980)). *See also, United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1953) (defendant must show that statute is vague as applied to specific conduct charged against him). *Accord, New York v. Ferber,* 458 U.S. 747, 767–68, 102 S.Ct. 3348, 3360–61, 73 L.Ed.2d 1113 (1982). "The test the court is concerned with here is whether the statute conveys an adequate warning as applied in a specific situation." *United States v. Parness,* 503 F.2d 430, 442 (2d Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

Finally, "[p]enal statutes are to be strictly construed. However, the strict construction rule does not permit the court to ignore legislative intent, nor require the court to reject that construction that best harmonizes with the design of the statute or the end sought to be achieved." *State v. Ortiz,* 74 Haw. 343, 352, 845 P.2d 547, 552, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993) (citations omitted).

As a preliminary matter, the defendant maintains he has standing to challenge HRS § 842–2(3) as "void on its face" because the statute regulates "association" and squarely falls under the freedom of association as guaranteed under the first and fourteenth amendments under the United States Constitution and the Hawai'i Constitution. The defendant cites to *Baird v. State Bar of Arizona,* 401 U.S. 1, 6, 91 S.Ct. 702, 705–06, 27 L.Ed.2d 639 (1971) for the proposition that "[t]he protection of the First Amendment also extends to the right of association." This argument is without merit. "The First Amendment's protection of association prohibits a State from excluding a person from a profession or punishing him solely because he is a member of a particular political organization or because he holds certain beliefs." *Id.* at 6, 91 S.Ct. at 706. HRS § 842–3 does not implicate these first amendment concerns because it is neither directed at, nor does it regulate or proscribe first amendment freedoms, i.e., membership in a political organization or certain beliefs held by an individual. This statute was intended to "curtail organized criminal activity in Hawaii." Hse. Stand. Comm. Rep. No. 668–72, in 1972 House Journal, at 967; Sen. Stand. Comm. Rep. No. 492–72, in 1972 Senate Journal, at 956; Hse. Stand Comm. Rep. No. 728–72, in 1972 House Journal, at 1006 (hereinafter "committee reports"). The statute is directed at proscribing conduct which is unrelated to constitutionally protected freedom of expression. *See State v. Miller,* 54 Haw. 1, 5, 501 P.2d 363 (1972) (upholding constitutionality of nuisance statute because it regulates conduct, not the communication of ideas). *See also, United States v. Andrews,* 749 F.Supp. 1520, 1522–23 (N.D.Ill.1990) (rejecting appellant's claim that the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) was void "on its face" because first amendment freedoms were not implicated; "[t]hus, because there is no conceivable implication of the First Amendment here, it is irrelevant that RICO may be unconstitutional with respect to theoretical and marginal cases before this Court.").

■ Because this case does not involve any first amendment issues, the defendant "has standing to raise a vagueness challenge only insofar as the statute is vague as applied to his or her specific conduct." *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 n. 6 (6th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996) (quoting *United States v. Pungitore*, 910 F.2d 1084, 1103 (3d Cir.1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 2010, 114 L.Ed.2d 98 (1991)). "[V]agueness challenges to statutes that do not implicate First Amendment freedoms are examined in light of the particular facts of the case at hand." *Andrews*, 749 F.Supp. at 1522 (citing *Ferber*, 458 U.S. at 767–68, 102 S.Ct. at 3360–61 (other citations omitted)). Consequently, in order for the defendant to succeed on a vagueness challenge, he must demonstrate that the term "associated with" as used in HRS § 842–2(3) is vague with respect to his conduct alleged here. *Id.* at 1523; *Ferber*, 458 U.S. at 767–68, 102 S.Ct. at 3360–61; *Harriss*, 347 U.S. at 617, 74 S.Ct. at 811–12; *Parness*, 503 F.2d at 442; *Paccione*, 738 F.Supp. at 698.

The first step in construing the constitutionality of HRS § 842–2 is to look to legislative intent. As previously noted, the legislative history underlying HRS § 842–2 provides that "[t]he purpose of [the] bill [was] to curtail organized crime activity in Hawai'i." *See* committee reports, *supra*. The House Judiciary Committee of the Hawai'i legislature also indicated that the statute

incorporat[ed] applicable provisions of federal law relating to racketeer influenced and corrupt organizations ... found in Chapter 96 [18 U.S.C. § 1962] of the United States Code Annotated. Those provisions directed particularly at individuals, prohibit racketeering activities, and provide criminal penalties, civil remedies, pro-

visions on evidence and civil investigative demand.

Hse. Stand. Comm. Rep. No. 728–72, in 1972 House Journal, at 1006–07.

18 U.S.C. § 1962(c) (1994), the Racketeering Influenced Corruptions Act (RICO) Act, upon which HRS § 842–2(3) was mirrored after, provides:

It shall be unlawful for any person employed by *or associated with any enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

*Id.* (emphasis added).[8] Insofar as this case involves one of first impression, and because HRS § 842–2 incorporated provisions of 18 U.S.C. § 1962, we look to the federal courts for guidance in cases interpreting the phrase "associated with any enterprise" under constitutional "void for vagueness" challenges. *See State v. Ontai*, 84 Hawai'i 56, 61, 929 P.2d 69, 74 (1996) ("[T]he most useful source in interpreting HRS § 842–2(3) is federal law."); *Price v. Obayashi*, 81 Hawai'i 171, 181, 914 P.2d 1364, 1374 (1996) ("[I]n instances where Hawai'i case law and statutes are silent, this court can look to parallel federal law for guidance.") (citations omitted).

Several federal courts have found the RICO statute, 18 U.S.C. § 1962(c), not to be unconstitutionally vague. *See Columbia Natural Resources, Inc.*, 58 F.3d 1101; *United States v. Tripp*, 782 F.2d 38 (6th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1656, 90 L.Ed.2d 199 (1986); *United States v. Ruggiero*, 726 F.2d 913 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Aleman*, 609 F.2d 298 (7th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Herman*, 589 F.2d 1191 (3d. Cir. 1978), *cert. denied*, 441 U.S. 913, 99 S.Ct.

---

8. The federal RICO statute contains the following language not contained in the Hawai'i statute, "interstate or foreign commerce," "directly or indirectly," and a "pattern of racketeering activity." The former is in reference to the Commerce Clause of the United States Constitution. *Ontai*, at 61 n.8, 929 P.2d at 74 n. 8 (1996). With respect to the latter, under the federal scheme

two acts of racketeering activity are required to constitute a pattern, *see* 18 U.S.C. § 1961(5), while the Hawai'i statute only requires one act. *Ontai*, at 61 n.8, 929 P.2d at 74 n. 8. The term "directly or indirectly," as provided under the federal statute, but absent in the Hawai'i statute, modifies the participation element.

2014, 60 L.Ed.2d 386 (1979); *United States v. Hawes,* 529 F.2d 472 (5th Cir.1976); *United States v. Campanale,* 518 F.2d 352 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Cappetto,* 502 F.2d 1351 (7th Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *United States v. Andrews,* 749 F.Supp. 1520 (N.D.Ill.1990); *United States v. Castellano,* 416 F.Supp. 125 (E.D.N.Y.1975); *United States v. Amato,* 367 F.Supp. 547 (S.D.N.Y.1973); *United States v. White,* 386 F.Supp. 882 (E.D.Wis.1974).⁹

The following courts have also specifically held that the term "associated with," as employed in the RICO statute is not unconstitutionally vague. *United States v. Swiderski,* 593 F.2d 1246, 1248–49 (D.C.Cir.), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2055, 2056, 60 L.Ed.2d 662 (1979) (§ 1962(c) not vague and, in particular, term, "employed by or associated with," not vague); *United States v. Paccione,* 738 F.Supp. 691, 698 (S.D.N.Y.1990); *United States v. Boffa,* 513 F.Supp. 444, 462 (D.Del.1980); *United States v. Thevis,* 474 F.Supp. 134, 139 (N.D.Ga.1979)("employed by or associated with ... enterprise" not vague), *affirmed,* 665 F.2d 616 (5th Cir.1982).

In *Paccione, supra,* the defendants moved to dismiss, *inter alia,* one count of the indictment based on the RICO statute as unconstitutionally vague arguing that the terms "pattern of racketeering activity," "enterprise" and "association" with the enterprise were so vague "as to provide little or no notice to any person of what conduct is prohibited and that the statute ... provided neither content nor standard to determine what these terms mean, nor have the courts provided any meaningful limitation." *Id.* at 694. In construing the term "associated with" the court observed:

> If the Government satisfactorily proves defendants' participation in or conduct of the enterprise's affairs through a pattern of racketeering activity as the statute requires, the Government will have satisfied the "associated with" requirement.

Whether or not defendants and their actions constituted an enterprise, or were associated with an enterprise, are matters of fact which the Government must prove at trial....

*Id.* at 698 (citations omitted).

Other courts, although not in the context of a constitutional "void for vagueness" challenge to the RICO statute, have liberally defined the terms "associated with" to include any relationship of the defendant with the business of the enterprise. *See Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993) (" '[O]utsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of its affairs—that is, participate in the operation or management of the enterprise itself[.]"). Justice Souter, in his dissent to *Reves,* also observed that:

> § 1962(c) covers not just those 'employed by' an enterprise, but those merely 'associated with' it, as well. And associates, (like employees) are prohibited not merely from conducting affairs of an enterprise through a pattern of racketeering, not merely from participating directly in such unlawful conduct, but even from indirect participation in the conduct of an enterprise's affairs in such a manner.

*Id.* at 188, 113 S.Ct. at 1174 (Souter, J., dissenting). In *United States v. Yonan,* 800 F.2d 164 (7th Cir.1986), cert. denied, 479 U.S. 1055, 107 S.Ct. 930, 93 L.Ed.2d 981 (1987), the court stated:

> Section 1962(c) literally prohibits persons employed by or associated with an enterprise from illicitly conducting or participating in the conduct of the enterprise's affairs; the statute makes no mention of such persons needing a stake or interest in the goals of the enterprise. Similarly, there is no statutory requirement that such persons have contact with policymakers or heads of enterprises before they can be said to be associated with it. In the absence of a statutory definition of association, the cases have adopted a common

**9.** The prohibitions in a RICO action are equally applicable to both criminal and civil cases. *Ontai,* at 62 n.10, 929 P.2d at 75 n. 10 (citing *Chang v. Chen,* 80 F.3d 1293, 1297 n. 1 (9th Cir.1996)).

Thus, there is no distinction between interpretation under the RICO statute of the term "associated with" in a criminal or civil case.

# 224

sense reading of the term that focuses on the business of the enterprise and the relationship of the defendant to that business. The cases make clear that the defendant need not have a stake in the enterprise's goals, but can associate with the enterprise by conducting business with it, even if in doing so the defendant is subverting the enterprise's goals.

. . . .

The nature of racketeering connections to an otherwise legitimate business suggests that elements outside a company may assist in obtaining the company's illegal goals. Thus the substantive proscriptions of the RICO statute apply to insiders and outsiders—those merely associated with an enterprise—who participate directly or indirectly in the enterprise's affairs through a pattern of racketeering activity. Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.

*Id.* at 167–68 (quoting *Schacht v. Brown,* 711 F.2d 1343, 1360 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983)) (other citations, internal quotations marks and emphasis omitted). *See also United States v. Mokol,* 957 F.2d 1410, 1417 (7th Cir.), *cert. denied,* 506 U.S. 899, 113 S.Ct. 284, 121 L.Ed.2d 210 (1992) ("Association does not require that the defendant be employed by or legitimately connected to the racketeering activity."); *United States v. Martino,* 648 F.2d 367, *vacated in part on other grounds,* 650 F.2d 651 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006,

2007, 72 L.Ed.2d 465 (1982) (18 U.S.C. § 1962 reaches persons employed or associated with enterprise who are not involved in management); *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (the RICO statute does not "punish mere association with conspirators or knowledge of illegal activity; its proscriptions are directed against conduct, not status."); *United States v. Forsythe,* 560 F.2d 1127, 1136 (3d Cir.1977) (The term "associated with" under 18 U.S.C. § 1962(c) includes "direct or indirect participation in the conduct of the enterprise.").[10]

■ In the absence of express legislative history concerning an interpretation of the term "associated with," and in light of federal case law, we adopt an expansive definition of the term "associated with" to include: (1) participation in the operation, management or conduct of the enterprise itself, *see Reves,* 507 U.S. at 185, 113 S.Ct. at 1173; (2) whether directly or indirectly, *id.* at 188, 113 S.Ct. at 1174–75 (Souter, J., dissenting); *Yonan,* 800 F.2d at 168; *Martino,* 648 F.2d at 394; and (3) regardless of a stake or interest in the goals of the enterprise. *Yonan,* 800 F.2d at 167.

Having set forth an interpretation of "associated with," we now turn to whether this term gives a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. *See Gaylord,* 78 Hawai'i at 138, 890 P.2d at 1178. Again, to determine if insufficient notice was provided to the defendant concerning the statute's prohibitions, the term "associated with" must be examined

10. The following courts have applied the term "associated with" in the following circumstances. *See United States v. Mokol,* 957 F.2d 1410 (7th Cir.), *cert. denied,* 506 U.S. 899, 113 S.Ct. 284, 121 L.Ed.2d 210 (1992) (sheriff's deputy who solicited bribes from poker machine vendors in exchange for police protection held to be associated with the vendor); *United States v. Yonan,* 800 F.2d 164 (7th Cir.1986), *cert. denied,* 479 U.S. 1055, 107 S.Ct. 930, 93 L.Ed.2d 981 (1987) (criminal defense attorney who bribed an Assistant State's Attorney in exchange for favorable treatment of his clients was associated with the Office of the State's Attorney as defined in § 1962(c)); *United States v. Lee Stoller Enterprises,* 652 F.2d 1313 (7th Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981) (defendant who took money intended for a sheriffs'

association, and paid-off the county sheriff in exchange for protection, was associated with the sheriff's office and conducted or participated in its affairs through a pattern of bribery); *United States v. Zauber,* 857 F.2d 137 (3d Cir.1988) (pension fund trustees were associated with the mortgage company that bribed trustees for investments); *United States v. Bright,* 630 F.2d 804 (5th Cir.1980) (bondsman who paid bribes to the county sheriff to maintain a monopoly in the bail-bond business, was associated with the sheriff's office, the racketeering enterprise); *United States v. Boffa,* 513 F.Supp. 444 (D.Del.1980)(the defendants were employed by and associated with an association which consisted of a group of individuals associated in fact for the purpose of making money through the interstate business of labor leasing and motor vehicle leasing).

in light of the conduct with which the defendant was charged.

Count Eight of the grand jury indictment, provided:

> That during or about the period of March, 1993, through April, 1993, inclusive, in the County of Maui, State of Hawaii, JESSIE JAMES ARRUDA BATES, KENNETH L. OLIVEIRA, JR., and DENNIS SATOSHI YOSHIDA, also known as "DASHO", being persons employed by or associated with any enterprise, did intentionally, knowingly, or recklessly conduct or participate in the conduct of the affairs of the enterprise through racketeering activity, to wit, extortion, and/or collection of an unlawful debt, to wit, a debt incurred in illegal gambling activity, thereby committing the offense of Racketeering in violation of Section 842–2(3) of the Hawaii Revised Statutes.

On August 16, 1993, the circuit court ordered the prosecution to file a bill of particulars, essentially instructing it to specify the role each defendant played with respect to the enterprise. The bill of particulars, filed on August 23, 1193, provided, with respect to Count Eight:

> The State incorporates herein its prior responses to the Defense claims under Counts Two, Three and Five.
>
> The Defense is further notified that the State intends to proceed under this count on the "collection of an unlawful debt theory" rather than an extortion theory.

The prosecution's response to Count Two provided in relevant part:

> As to the Defense claim that the "enterprise" and their association with the enterprise are insufficiently defined, the Defense is hereby notified that the State intends to proceed on the theory that Defendant Yoshida was the "bookmaker" and that Defendants Oliveira and Bates were the "collection enforcers" for an illegal sports-betting operation during the various periods in question.
>
> Since the term "enterprise" is defined broadly in Haw.Rev.Stat. § 842–1, to include "any group of individuals associated for a particular purpose although not a legal entity," the Defendant is again notified that the State intends to proceed on the theory that the three named Defendants and other individuals associated with the illegal sports betting operation, as more specifically described in the Grand Jury transcript and police reports, are the "enterprise."

The response to Count Three provided:

> The defense is hereby notified that the State intends to proceed under the "collection of an unlawful debt, to wit, a debt incurred in illegal gambling activity" theory.

Finally, the prosecutions' response to Count Five provided:

> The Defense is hereby notified that the State intends to proceed on the "associated with" rather than the "employed by" theory.
>
> [T]he defense is further notified that the state intends to proceed under this count on the "collection of an unlawful debt theory" rather than an extortion theory.

■ The enterprise as charged in the indictment and set forth in the bill of particulars was comprised of the defendant, Oliveira and Yoshida associated for the purpose of an illegal sports betting operation. The indictment alleges that Yoshida was the bookmaker of this enterprise and the defendant and Oliveira were the collection-enforcers. The issue, simply framed, is whether a person of ordinary intelligence would know that, by acting as a collection enforcer for a bookmaker for the purpose of collecting an unlawful debt, such conduct might constitute participating, either directly or indirectly, in the conduct of the enterprise. That is, whether a person would know such conduct might constitute being "associated with" that enterprise. We conclude that it does. The defendant's role and relationship to the enterprise was clearly defined and he was thereby put on notice that, as an alleged collection enforcer, he was charged with participating in the conduct of the enterprise. It is implausible for the defendant to claim that by so acting, he was unaware that he was "associated with" the enterprise. "The [RICO] statute need not be exact.... [I]t must simply put the party on notice that it is entering a

potentially forbidden zone." *Columbia Natural Resources, Inc.,* 58 F.3d at 1109. *See also Ontai,* 84 Hawai'i at 60 n. 6, 929 P.2d at 73 n. 6 (citing *State v. Buch,* 83 Hawai'i 308, 926 P.2d 599 (1996) ("The fact that a statute is ambiguous and requires statutory construction does not necessarily mean that it is unconstitutionally vague.")). The indictment and bill of particulars clearly delineate the defendant's relationship to the enterprise, so as to make the term, "associated with" not unconstitutionally vague. *Cf. id.* ("Although the term 'enterprise' in HRS § 842–2 is ambiguous for purposes of statutory construction it provides a reasonable degree of notice and therefore does not render the statute unconstitutionally vague.").

Moreover, the defendant states in his brief on appeal that "[t]here was no evidence that [he] received any financial benefit from his discussion with Fukushima," implying that, for this reason, he was not associated with the enterprise. As previously discussed, one need not have "a stake or interest in the goals of the enterprise" in order to be associated with it. *Yonan,* 800 F.2d at 167.

Accordingly, we hold that, although the term "associated with" is broad, it is not unconstitutionally vague under the Hawai'i Constitution. The defendant's second assignment of error is without merit.

### C. *Impeachment Evidence*

In his third assignment of error, the defendant alleges the trial court erred in permitting the prosecution to introduce highly prejudicial evidence, consisting of the names of three alleged organized crime figures,[11] for the purpose of impeaching the defendant's credibility. Alternatively, the defendant argues that even if the introduction of this evidence was relevant, the trial court erred in permitting its introduction pursuant to Hawai'i Rules of Evidence (HRE) 403.

During his direct examination, the defendant stated that he was a resident of Oahu and that he was visiting Maui for legitimate business purposes. During cross-examination of the defendant, the prosecutor questioned him regarding several meetings he had with co-defendant Yoshida on Maui in September of 1992. The defendant testified they met several times to discuss "the trucking business." Upon further questioning, the defendant admitted that co-defendant Oliveira was also present as well as a "couple more friends." When pressed to provide their names, the defendant stated he could not remember. Thereafter, the prosecutor queried, "Do you know someone by the name of Takeo Yamauchi?" The defendant objected and all parties retired into the judge's chambers for a conference.

The prosecution made an offer of proof that in light of the defendant's testimony that the sole purpose of his visit to Maui with Yoshida and others was to discuss the trucking business, an otherwise legitimate business purpose, it sought to impeach his credibility with evidence that the defendant, in fact, met with Takeo Yamauchi and Rocky Naeole, for illicit or illegitimate purposes. The prosecution was prepared to introduce extrinsic evidence that a witness observed the defendant in the company of these men at the Maui Beach Hotel in September of 1992, and that the purpose of this meeting was unrelated to discussions of the trucking business. It represented that this evidence would impeach the defendant's prior testimony should he deny these facts.[12] The prosecution also sought the introduction of these names to prove that the defendant was involved in an enterprise with at least two of these men.[13] The trial court ruled that the

11. Defendant argues in his brief that he was prejudiced by the mere mention of the names Takeo Yamauchi, Rocky Naeole and Charlie Russell alleging they are "well-known organized crime figures." There is no evidence in the record to support this contention.

12. During this conference, counsel for the defendant asked "How will we advance the proof in this case by interjecting the names of Takeo Yamauchi and Mr. Neole in this trial?" The

prosecutor answered, "Because if your guy says that was a meeting about trucking, then that may raise us to investigate further whether or not these people have anything to do with trucking on Maui, and if they do, whether or not your client is being straight with us and candid."

13. The bill of particulars provided that the enterprise consisted of "the three named Defendants *and other individuals* associated with the illegal sports betting operation[.]"

prosecution could introduce these names because (1) they were relevant, and (2) they could be used for the purpose of impeaching the defendant's credibility regarding the purpose of his visits to Maui and who was present at the meeting in September of 1992. The court refused to allow the introduction of these names for the purpose of proving the enterprise element of the HRS § 842–2(3) charge.

When cross-examination resumed in the presence of the jury, the prosecution asked the defendant if he knew Takeo Yamauchi and Rocky Naeole. The defendant admitted meeting with these men at the Maui Beach Hotel in September of 1992 in a meeting also attended by Yoshida and Oliveira. When the prosecutor asked the defendant about Charlie Russell, the defendant objected on relevancy grounds, and the trial court sustained the objection, stating, "[w]hatever he talked to Charlie Russell about is not relevant to this case." The court thereafter prohibited any further questioning by the prosecution as to these three men.

### 1. *Standard of Review*

 [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. *Kealoha v. County of Hawaii*, 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied*, 74 Haw. 650, 847 P.2d 263 (1993). Where the evidentiary ruling at issue concerns the admissibility based upon relevance, under ... [HRE] Rules 401 and 402, the proper standard of appel-

late review is the right/wrong standard. *See State v. Toro*, 77 Hawai'i 340, 347, 884 P.2d 403, 410 (Haw.Ct.App.), *cert. denied*, 77 Hawai'i 489, 889 P.2d 66 (1994).

*State v. Kupihea*, 80 Hawai'i 307, 314, 909 P.2d 1122, 1129 (1996) (some brackets in original and some added). "Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." *Walsh v. Chan*, 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995) (citing *Sato v. Tawata*, 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995)). "HRE 404 represents a particularized application of the principle of HRE 403 (*see* Commentary to HRE 404), and we will employ the same abuse of discretion standard of review." *State v. Alston*, 75 Haw. 517, 538, 865 P.2d 157, 168 (1994) (brackets and internal quotations omitted).

 The defendant contends the mere mention of the names of Yamauchi, Russell and Naeole was prohibited under HRE Rule 404(b) which prevents the introduction of evidence of "[o]ther crimes, wrongs or acts ... to prove character of a person in order to show that he acted in conformity therewith." HRE Rule 404(b). We disagree. The prosecution was neither attempting to prove the character of the defendant, nor attempting to introduce other crimes, wrongs or acts of the defendant. The prosecution argues the proper evidentiary rule upon which this evidence was admitted was HRE Rule 608(b).[14] We disagree with this also.

The court permitted the prosecution to cross-examine the defendant regarding his meeting in Maui in September 1992 with Yamauchi and Naeole for purposes of impeaching his credibility, namely, that the sole purpose of this meeting and his visit to Maui, was to discuss legitimate business.[15] In re-

**14.** HRE Rule 608(b) provides:
 Specific instances of the conduct of a witness, for the purpose of attaching the witness' credibility, if probative of untruthfulness, may be inquired into on cross-examination of the witness and, in the discretion of the court, may be proved by extrinsic evidence....
 The Commentary to this rule further provides that "[i]f the witness admits on cross-examination having committed the prior misdeed, then there is no need for the extrinsic evidence and

Rule 403 will exclude it. Even if the witness denied the material, the Rule 403 balance is expected to dictate exclusion in a substantial number of cases...." Commentary to HRE Rule 608(b).

**15.** The prosecution never had the opportunity to receive a response from the defendant concerning Charlie Russell because the defendant objected, and the court then prohibited any further questioning.

viewing the record immediately following this conference and the court's ruling, we note that although the purpose of the questioning was impeachment, it did not impeach the defendant. This evidence then, did not fall within the purview of HRE Rule 608(b).

■ The evidence, nonetheless, was relevant to the issue of who the defendant met with when he came to Maui. A proper foundation was laid by the prosecutor as to relevancy and there is no allegation that the prosecution did not have a good faith basis for raising these names. Moreover, even if the names were notorious, mere mention is insufficient to make it more prejudicial than probative. Therefore, the trial court was "right" in permitting the introduction of these names on relevancy grounds.

Alternatively, the defendant argues that even if HRE Rule 404(b) was not violated, the trial court failed to engage in a HRE Rule 403 balancing, and had the court done so, this evidence should have been excluded because the probative value was substantially outweighed by the danger of unfair prejudice.

■ "[T]he determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a 'cost-benefit calculus' and a 'delicate balance between probative value and prejudicial effect[.]'" *Sato*, 79 Hawai'i at 19, 897 P.2d at 946 (citations omitted). Moreover, "[i]n weighing probative value versus prejudicial effect ... [,] a variety of matters must be considered, including ... the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility." *State v. Renon*, 73 Haw. 23, 38, 828 P.2d 1266, 1273, *reconsideration denied,*

73 Haw. 625, 858 P.2d 734 (1992) (citations and footnote omitted).

■ In the instant case, the trial court was confronted with a "judgement call." After determining that evidence concerning the individuals in question was relevant, it was required to determine if the probative value outweighed substantial prejudice to the defendant. Contrary to the defendant's assertions, we are unaware of any precedent, nor has the defendant cited to any, requiring a trial court to state for purposes of the record, the balancing of competing interests under HRE Rule 403. In the absence of this requirement, it cannot be inferred that by reason of this "on the record" omission, the court failed to engage in the requisite balancing. To the contrary, it can be inferred from the record that the court properly engaged in a HRE Rule 403 analysis in light of the fact that, although the court initially permitted the prosecution to cross-examine the defendant as to whether he met with Yamauchi, Neole and Russell, it later, prohibited it from any further cumulative impeachment. In light of the broad discretion accorded to a trial court, we hold that the court did not abuse its discretion in permitting the introduction of this evidence because the probative value of this impeachment evidence outweighed any substantial evidence to the defendant. Therefore, the defendant's third assignment of error is without merit.

### D. Prosecutorial Misconduct

■ In his final assignment of error, the defendant refers to several instances where he alleges the prosecutor engaged in misconduct during closing argument.[16] Because defense counsel did not object to the prosecutor's remarks, these remarks must rise to the

---

**16.** Examples listed by the defendant in his brief include, *inter alia:*
> (1) "Like I said, Yoshida drove him to the home, because there's no way he would have remembered that house eight months later, especially since he wasn't paying attention the first time he went to the house."
> (2) "The State's position on this is that you shouldn't need to consider conspiracy. I don't know, because they're guilty of the offense that we've charged them with."

> (3) "They committed extortion or racketeering."
> (4) "But of the other offenses, they're guilty."
> (5) "We've got no reason not to name Jessie Bates if Jessie Bates was there."
> (6) "Well, you know Ted Bundy, the serial killer—I'm not saying it has anything to do with this analogy—Ted Bundy was going to law school in all those towns that he killed those ladies in. He had a legitimate reason for being there."

level of plain error and affect the substantial rights of the defendant in order to warrant reversal. *State v. Marsh*, 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986).

It is well-recognized that prosecutors in this state are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses. *Id.* at 661, 728 P.2d at 1302. Apart from these restrictions, prosecutors are permitted to draw reasonable inferences from the evidence and are also afforded wide latitude in discussing the evidence, *State v. Apilando*, 79 Hawai'i 128, 141–42, 900 P.2d 135, 148–49 (1995) (citations omitted), and may state, discuss and comment on the evidence. *State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996) (citation omitted). In *Clark*, this court held that a prosecutor's closing remark that, "[w]hen the defendant comes in here and tells you that he was not on cocaine that night, that just—it's a cockamamie story and it's asking you to take yourselves as fools[,]" was proper because it represented a fair characterization of the evidence presented against the defendant. *Id.* at 306, 926 P.2d at 211. The court observed that the prosecutor "was well within the limits of propriety to infer, and indeed argue, that Clark's denial of drug usage was improbable, untruthful, and, in short, a 'cockamamie story.' " *Id.*

Upon review of the statements presented, we conclude that they represent reasonable inferences drawn from the evidence regarding the defendant's credibility and the strength of the prosecution's case and were within the bounds of proper argument. With respect to the prosecutor's reference to Ted Bundy, in *Clark, supra,* we cited with approval *People v. Smith*, 122 Mich.App. 106, 332 N.W.2d 428, 430 (1982) which upheld a prosecutor's reference to Charles Manson during closing argument and statement characterizing the defendant's testimony that "I would submit to you that that would be insulting your intelligence and it's clearly a cock and bull story." *Id.* at 305, 926 P.2d at 210. We similarly conclude that mere reference to this name was not prosecutorial misconduct.

Accordingly, we hold the defendant's fourth assignment of error is also without merit.

### III. *Conclusion*

Based on the foregoing, we affirm the judgment of the trial court and affirm the defendant's convictions on all counts.