157 P.3d 539

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**John KEAWEMAUHILI, Defendant–Appellant.**

**State of Hawai'i, Plaintiff–Appellee,**

v.

**Marie Beltran, Defendant–Appellant.**

**State of Hawai'i, Plaintiff–Appellee,**

v.

**Wendell Lucas, Defendant–Appellant.**

**Nos. 26066, 26096, 26114.**

Intermediate Court of Appeals of Hawai'i.

April 5, 2007.

Certiorari Granted Sept. 5, 2007.

---

Warren H. Kim, for defendant-appellant John Keawemauhili.

Ryan Yeh, deputy prosecuting attorney, City and County of Honolulu (Mark Yuen and Alexa D.M. Fujise, deputy prosecuting attorneys, on the brief), for plaintiff-appellee State of Hawai'i.

Kirsha Durante, deputy public defender, State of Hawai'i (Deborah L. Kim, deputy public defender, on the briefs), for defendant-appellant Marie Beltran.

Leland B.T. Look, Honolulu, for defendant-appellant Wendell Lucas.

BURNS, C.J., WATANABE, and NAKAMURA, JJ.

Opinion of the Court by WATANABE, J.

Defendants–Appellants John K. Keawemauhili (Keawemauhili), Marie Beltran (Beltran), and Wendell Lucas (Lucas) (collectively, Appellants) appeal from separate judgments entered by the District Court of the First Circuit (the district court),[1] convicting them of camping without a permit, in violation of Revised Ordinances of Honolulu (ROH) § 10–1.3(a)(2) (1990, as am. Ord. 96–58) (the Camping Ordinance).

We vacate the judgments and remand for further proceedings consistent with this opinion.

## BACKGROUND

Keawemauhili, Beltran, and Lucas were each arrested by citation[2] for allegedly camping without a permit at Mokulēʻia Beach Park, in violation of ROH § 10–1.3(a)(2). ROH § 10–1.3 (1990), which is part of article 1 of ROH chapter 10, provides, in pertinent part, as follows:

**Permits.**

(a) Required. Any person using the recreational and other areas and facilities under the control, maintenance, management and operation of the department of parks and recreation shall first obtain a permit from the department for the following uses:

. . . .

(2) Camping[.]

. . . .

(b) Director to Promulgate Rules and Regulations. The director shall promulgate rules and regulations pursuant to [Hawaii Revised Statutes (HRS)] Chapter 91, to govern the use of said areas and facilities which will:

(1) Ensure maximum permissible use of said areas and facilities by appropriate distribution of users;

(2) Ensure proper, orderly and equitable use of areas and facilities through scheduling and user controls;

(3) Ensure protection and preservation of areas and facilities by not overtaxing facilities;

(4) Promote the health, safety and welfare of the users of said areas and facilities;

(5) Establish procedures for obtaining permits and revocation therefor; or

(6) Recommend to council fee schedules, based upon the cost of administration for each activity authorized under paragraph (10) of this subsection.

(c) Conditions of Permit. Permits shall be issued pursuant to the provisions contained in this article and to the rules and regulations promulgated by the director, and they shall be subject to the conditions in this article and to any rules and regulations promulgated by the director. Any violation of the provisions contained in this article, or of any rules and regulations promulgated by the director which implement said provisions, or of any conditions contained in this article, or of any rules and regulations promulgated by the director which implement said conditions, or of the terms or conditions contained in the permit which violation is caused by the permittee, members of the permittee's group, officers, employees or the permittee's agents shall constitute ground for revocation of the permit by the director of parks and recreation. Any permittee whose permit has been revoked by the director may appeal to the city council pursuant to the rules and regulations authorized, and said appeal must be filed by the permittee within 30 days of the mailing of a notice of said revocation to the last known address of the permittee.

Pursuant to ROH § 10–1.6(d)(1) (1990), a person convicted of camping without a permit "shall be punished by a fine of not more than

---

1. The Honorable Clarence Pacarro (Judge Pacarro) entered the judgments.

2. The citations of arrest for Defendants–Appellants John K. Keawemauhili, Marie Beltran, and

Wendell Lucas (collectively, Appellants) are not included in the records on appeal of their respective cases.

$500.00 or by imprisonment for not more than 30 days, or by both such fine and imprisonment." In accordance with HRS § 701–107 (1993),[3] which is part of the Hawaii Penal Code (HPC), an offense punishable by imprisonment ordinarily constitutes a crime and is classified as a petty misdemeanor.

The Camping Ordinance went into effect on June 2, 1971 and has remained unchanged since it was enacted by Ordinance No. 3738 in 1971 by the City Council of the City and County of Honolulu (the City). The camping-without-a-permit offense thus preexisted the HPC, which was enacted in 1972 pursuant to Act 9, 1972 Hawaii Session Laws § 32 and became effective on January 1, 1973. *Id.*, § 3 at 142.

The Camping Ordinance neither defines "camping" nor specifies the state of mind required for conviction. However, the Director of the City Department of Parks and Recreation (the Director), pursuant to the authority vested in the Director by ROH § 10–1.3(b) (1990), has promulgated adminis-

trative rules that govern camping at City parks. At the time Appellants were arrested, the rules defined "camping" as follows:

"Camping" means the use of public park for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities. *The above-listed activities constitute camping when it reasonably appears, in light of the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.*

Amended Camping Policy, Rules and Regulations Governing Camping at City Parks (the Camping Rules) § 3(5) (Eff: 9/10/86, Am. 11/25/96)[4] (emphasis added). The Camping

---

3. At the time Appellants were arrested for camping without a permit, Hawaii Revised Statutes (HRS) § 701–107 (1993), which is part of the Hawaii Penal Code (HPC), provided, in relevant part, as follows:

**Grades and classes of offenses.** (1) *An offense defined* by this [HPC] or *by any other statute of this State for which a sentence of imprisonment is authorized constitutes a crime.* Crimes are of three grades: felonies, misdemeanors, and petty misdemeanors. . . .

. . . .

(4) *A crime is a petty misdemeanor* if it is so designated in this [HPC] or in a statute other than this [HPC] enacted subsequent thereto, or *if it is defined by a statute other than this [HPC] which provides that persons convicted thereof may be sentenced to imprisonment for a term of which the maximum is less than one year.*

(Emphases added.) In 2005, subsection (4) of HRS § 701–107 was amended to substitute "thirty days" for "one year" and "clearly define a petty misdemeanor as a criminal offense for which the maximum prison term is not to exceed thirty days." Supplemental Commentary on HRS § 701–107. As used in HRS § 701–118(1) (1993), "unless a different meaning plainly is required," the term "statute" is defined to include "the Constitution of the State and a local law or ordinance of a political subdivision of the State[.]"

4. The rules promulgated by the Director of the Department of Parks and Recreation, City and County of Honolulu (the City) to implement Re-

vised Ordinances of Honolulu (ROH) § 10–1.3(a)(2) (1990, as am. Ord. 96–58) have undergone several transformations since they were originally adopted in 1971.

As originally promulgated in 1971, the rules defined "camping" as "[t]he act of sleeping during night time in public parks, provided that this definition shall not be construed to include the act of fishing, crabbing, or other like activities." *Camping Policy, Rules and Regulations, City Department of Parks and Recreation* (1971).

In 1981, the definition of "camping" was amended to "[t]he act of setting up camping equipment, including the possession of a sleeping bag, blanket or other like item, or the act of using a van, trailer, camper or other vehicle for the purpose of sleeping or staying overnight in a public park." *Amendment to Camping Policy, Rules and Regulations, City Department of Parks and Recreation* (1981).

In 1984, the definition of "camping" was amended to "[t]he act of sleeping during nighttime hours on the premises or the use or occupation of the premises by one or more persons who remain or intend to remain on the premises past the hour of 12 midnight." *Amended Camping Policy, Rules and Regulations § 2, City Department of Parks and Recreation* (1984). Additionally, definitions were added for "act of sleeping" ("an act resembling a person in the natural state of bodily rest, marked by suspension of consciousness, whether or not in a reposed, seated, or slouched position") and "[n]ighttime" (the

Rules, therefore, set forth an objective standard for determining whether, under the totality of the circumstances, a person reasonably appears to be camping.

During the proceedings below, Appellants moved to dismiss the charges against them on the grounds that: (1) Camping Rule § 3(5) unlawfully relieved Plaintiff–Appellee State of Hawai'i (the State) from proving, beyond a reasonable doubt, that Appellants camped without a permit with the requisite state of mind; (2) the Camping Ordinance, by failing to define "camping," is unconstitutionally vague; and (3) the Camping Ordinance, as fleshed out by the Camping Rules, is overly broad.

At a hearing held on May 29, 2003, the district court[5] orally ruled that: (1) although the Camping Ordinance does not specify a state-of-mind requirement for the elements of the camping-without-a-permit offense, the default "intentional, knowing, or reckless" state of mind set forth in HRS § 702–204 (1993) applies to the offense; (2) the Camping Ordinance is not defective or flawed on its face; and (3) the Camping Ordinance, as fleshed out by the Camping Rules, is not overly broad or unconstitutional. Accordingly, the district court denied Appellants' motions to dismiss. The district court then set all three cases for trial on the same date.

Appellants thereafter entered conditional no-contest pleas that allowed them to appeal the denial of their motions to dismiss. The district court[6] accepted the pleas and entered separate judgments convicting Appellants as charged and sentencing each of them to pay a $20 fine, payment of which was suspended pending appeal. Appellants filed separate appeals, which this court consolidated pursuant to an order entered on December 2, 2005.

## ISSUES ON APPEAL

Appellants cumulatively assert the following points of error on appeal: (1) the Director and the Mayor of the City had no authority to promulgate a rule that converted the camping-without-a-permit offense to a

strict liability offense; (2) the district court erred in determining that HRS § 702–204 supplied the "intentional, knowing, or reckless" mental state that was required to be established, beyond a reasonable doubt, for each element of the camping-without-a-permit offense; (3) the Camping Ordinance, standing alone, is vague and ambiguous and should be struck down as violative of the due process clauses of the United States and Hawai'i constitutions; and (4) the Camping Ordinance, when construed with Camping Rule § 3(5), is unconstitutionally overbroad.

## DISCUSSION

### A. The City's Rulemaking Authority

Appellants contend that the Camping Rules adopted by the Director and approved by the Mayor converted the camping-without-a-permit offense to a strict liability crime. This was improper, they maintain, because pursuant to HRS § 702–212 (1993), a strict liability crime cannot exist unless "a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears" and the Director and the Mayor, being part of the Executive Branch, cannot express legislative intent for the City.

We conclude below that the camping-without-a-permit offense defined by the Ordinance is a strict liability offense. The Camping Ordinance was enacted by the City Council, which was clearly vested with the legislative power of the City. *See* Haw. Const. art. VIII, § 1; HRS § 46–1.5 (Supp. 2006); Revised Charter of Honolulu art. I, § 3–101 (2000 & Supp.2003). Therefore, we find it unnecessary to address this point on appeal.

### B. *Whether the District Court Erred in Applying HRS § 702–204 to Supply the "Intentional, Knowing, or Reckless" State of Mind for the Elements of the Camping–Without–a–Permit Offense*

During the proceedings below, Appellants argued that Camping Rule § 3(5), by ex-

---

"hours between one-half hour after sunset and one-half hour before sunrise"). *Id.*

**5.** The Honorable Rhonda A. Nishimura presided at the hearing.

**6.** Judge Pacarro presided.

pressly disregarding "the intent of the participants" and applying an objective "reasonably appears" standard for determining whether a person is camping, converted the camping-without-a-permit offense into an absolute liability crime, in violation of HRS §§ 701–114 (1993),[7] 702–204,[8] and 702–212,[9] which required that the State establish, beyond a reasonable doubt, that Appellants acted intentionally, knowingly, or recklessly with respect to each element of the camping-without-a-permit offense.

The district court sidestepped this argument by applying the default "intentional, knowing, or reckless" state-of-mind requirement set forth in HRS § 702–204 to the offense. The district court's application of the default state of mind to the offense is consistent with prior Hawai'i Supreme Court decisions that have relied on HRS § 702–204 to supply the state-of-mind requirements for offenses defined by statutes outside the HPC that are silent as to the requisite state of mind. *See, e.g., State v. Carvalho,* 58 Haw.

314, 315, 568 P.2d 507, 508 (1977) (holding that since § 15–26.3 [10] of the City Traffic Code (1969) failed to specify the state of mind required to establish the misdemeanor offense of failing to appear in response to a summons or citation issued by an officer upon arrest for a traffic violation, "HRS § 702–204 requires that it be shown that a defendant acted intentionally, knowingly or recklessly in failing to appear"); *State v. Rushing,* 62 Haw. 102, 105, 612 P.2d 103, 106 (1980) (holding that a legislative purpose to impose absolute liability for the misdemeanor offense of welfare fraud does not plainly appear in the second paragraph of HRS § 346–34 [11] and "the mere absence of a specification of the requisite state of mind does not provide a sufficient basis from which to override the general policy of the [HPC] that absolute or strict liability in the penal law is indefensible if conviction results in the possibility of imprisonment and condemnation"); *State v. Pinero,* 70 Haw. 509, 526, 778 P.2d 704, 715

7. HRS § 701–114 (1993) states, in pertinent part:

 **Proof beyond a reasonable doubt.** (1) Except as otherwise provided in section 701–115, no person may be convicted of an offense unless the following are proved beyond a reasonable doubt:
 (a) Each element of the offense;
 (b) The state of mind required to establish each element of the offense;
 . . . .
 (2) In the absence of the proof required by subsection (1), the innocence of the defendant is presumed.

8. HRS § 702–204 (1993) states, in pertinent part:

 **State of mind required.** Except as provided in section 702–212, a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense. When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly.

9. HRS § 702–212 (1993) states, in pertinent part:

 **When state of mind requirements are inapplicable to violations and to crimes defined by statutes other than this [HPC].** The state of mind requirements prescribed by sections 702–204 and 702–207 through 702–211 do not apply to:

 (1) An offense which constitutes a violation, unless the state of mind requirement involved is included in the definition of the violation or a legislative purpose to impose such a requirement plainly appears; or
 (2) A crime defined by statute other than this [HPC], insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears.

10. Section 15–26.3 of the City Traffic Code (1969) provided: "Any person who fails to appear at the place and within the time specified in the summons or citation issued to him [or her] by an officer upon his [or her] arrest for any traffic violation is guilty of a misdemeanor[.]"

11. The second paragraph of HRS § 346–34 provided:

 If, at any time while the recipient of public assistance is receiving such assistance, his [or her] living requirements are reduced and he [or she] fails to report the reduction within thirty days from the date of the reduction to the department, or he [or she] acquires from any source real property, funds, income, or other resources and fails to report the amount of same together with the source of the resources to the department within thirty days of receipt of same, or prior to spending or otherwise disposing of all or any portion of the same, he [or she] shall be deemed guilty of fraud[.]
 *State v. Rushing,* 62 Haw. 102, 103, 612 P.2d 103, 105 (1980) (italics omitted).

(1989) (holding that the void in HRS § 134–7(b) for failing to specify the state of mind required to establish the elements of an offense prohibiting possession of a firearm by a previously convicted felon "is not fatal" because HRS § 702–204 provides that in such instances, the state-of-mind element is established if a person acts intentionally, knowingly, or recklessly); *State v. Eastman,* 81 Hawai'i 131, 913 P.2d 57 (1996) (holding that the default state of mind set forth in HRS § 702–204 applies to the offense of abuse of a family or household member, a violation of HRS § 709–906(1) (Supp.1994), since the statutory language does not describe a culpable state of mind attendant to the prohibited acts and does not expressly impose absolute liability).

We note, however, that none of the foregoing cases discussed the interplay between HRS §§ 702–204, 702–212, and 702–213 (1993) and the role that HRS § 702–213 was to play in decriminalizing existing absolute liability offenses defined by statutes outside the HPC and existing at the time the HPC was enacted. Based on our review of the HPC and the organizational framework that the HPC established for classifying and treating offenses defined by statutes outside the HPC, we conclude that the Camping Ordinance, given its silence as to the state of mind necessary to commit the offense, defined a strict or absolute liability offense. Furthermore, since no legislative purpose to impose absolute liability for the Camping Ordinance plainly appears with respect to any element of the offense, we conclude that HRS § 702–213(1) (1993) [12] converted the offense to a civil violation punishable by a fine only, unless Appellants were expressly charged with committing the offense with a negligent state of mind pursuant to HRS § 702–213(2) (1993). [13]

### 1. *The Historical Development of Strict Liability Offenses*

Historically, under Anglo–American principles of criminal jurisprudence, no crime existed unless the wrongful act was accompanied by a guilty mind or *mens rea.* As the United States Supreme Court observed in *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952),

> [c]rime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil. As the state codified the common law of crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation. Courts with little hesitation or division, found an implication of the requirement as to offenses that were taken over from the common law.

*Id.* at 251–52, 72 S.Ct. 240 (footnotes omitted).

As time went on, however, offenses "with very different antecedents and origins" arose. *Id.* at 252, 72 S.Ct. 240.

> *The crimes there involved depend on no mental element but consist only of forbidden acts or omissions. This ... is made clear from examination of a century-old*

---

**12.** HRS § 702–213 (1993) provides, in relevant part, as follows:

> **Effect of absolute liability in reducing grade of offense to violation.** Notwithstanding any other provisions of existing law and unless a subsequent statute otherwise provides:
>
> (1) When absolute liability is imposed with respect to any element of an offense defined by a statute other than this [HPC] and a conviction is based upon such liability, the offense constitutes a violation except as provided in section 702–212(2).
>
> (2) Although absolute liability is imposed by law with respect to one or more of the elements of an offense defined by a statute other than this [HPC], the culpable commis-

sion of the offense may be charged and proved, in which event negligence with respect to such elements constitute a sufficient state of mind and the classification of the offense and the sentence that may be imposed therefor upon conviction are determined by section 701–107 and chapter 706.

**13.** The transcripts of the hearings at which Appellants were orally charged with camping without a permit, in violation of ROH § 10–1.3(a)(2) (1990, as am. Ord. 96–58) (the Camping Ordinance) are not included in the record on appeal. The record on appeal also does not include any written complaint charging Appellants with camping without a permit.

*but accelerating tendency ... to call into existence new duties and crimes which disregard any ingredient of intent.* The industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. *Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare. While many of these duties are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called 'public welfare offenses.' These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty.* Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize.

*Id.* at 252–55, 72 S.Ct. 240 (emphases added, footnotes omitted). The growth of absolute liability offenses stemmed from state authority:

While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. *Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element.* The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. *Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.*

*Id.* at 256, 72 S.Ct. 240 (emphases added).

Professor Wayne R. LaFave, in discussing the growth of strict liability offenses, observed that

legislatures, especially in the 20th and 21st centuries, have often undertaken to impose criminal liability for conduct unaccompanied by fault. *A statute may simply provide that whoever does (or omits to do) so-and-so, or whoever brings about such-and-such a result, is guilty of a crime, setting forth the punishment.* Usually, but not always, the statutory-crime-without-fault carries a relatively light penalty—generally of the misdemeanor variety. Often this statutory crime has been created in order to help the prosecution cope with a situation wherein intention, knowledge, recklessness or negligence is hard to prove, making convictions difficult to obtain unless the fault element is omitted. The legislature may think it important to stamp

out the harmful conduct in question at all costs, even at the cost of convicting innocent-minded and blameless people. It may expect a lot of prosecutions in a certain area of harmful activity and therefore wish to relieve the prosecuting officials of the time-consuming task of preparing evidence of fault. Doubtless with many such crimes the legislature is actually aiming at bad people and expects that the prosecuting officials, in the exercise of their broad discretion to prosecute or not to prosecute, will use the statute only against those persons of bad reputation who probably actually did have the hard-to-prove bad mind, letting others go who, from their generally good reputation, probably had no such bad mental state.

. . . .

... *It is rare if ever that the legislature states affirmatively in a statute that described conduct is a crime though done without fault. What it does is simply to omit from the wording of the statute any language ("knowingly," "fraudulently," "wilfully," "with intent to," etc.) indicating that fault is a necessary ingredient.* Since crimes usually do require some fault (as expressed by the old maxim *actus non facit reum nisi mens sit rea*), the defendant often argues as to a particular statutory crime of which he is accused that the legislature really meant to require some fault.

Criminal statutes which are empty of words denoting fault, ... have been dealt with in various ways by the courts. Sometimes the court holds that the statute means what it says and so imposes criminal liability without regard to fault. But sometimes the court reads into the statute some requirement of fault, the absence of which fault constitutes a defense; the court may, however, place upon the defendant the burden of coming forward with some evidence of, or perhaps even of persuading the jury of the absence of this fault.

A number of factors may be considered of importance in deciding whether the legislature meant to impose liability without fault or, on the other hand, really meant to require fault, though it failed to spell it out clearly. (1) The legislative history of the statute or its title or context may throw some light on the matter. (2) The legislature may have in some other statute provided guidance as to how a court is to determine whether strict liability was intended. (3) The severity of the punishment provided for the crime is of importance. Other things being equal, the greater the possible punishment, the more likely some fault is required; and conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault. (4) The seriousness of harm to the public which may be expected to follow from the forbidden conduct is another factor. Other things being equal, the more serious the consequences to the public, the more likely the legislature meant to impose liability without regard to fault, and vice versa. (5) The defendant's opportunity to ascertain the true facts is yet another factor which may be important in determining whether the legislature really meant to impose liability on one who was without fault because he lacked knowledge of these facts. The harder to find the truth, the more likely the legislature meant to require fault in not knowing; the easier to ascertain the truth, the more likely failure to know is no excuse. (6) The difficulty prosecuting officials would have in proving a mental state for this type of crime. The greater the difficulty, the more likely it is that the legislature intended to relieve the prosecution of that burden so that the law could be effectively enforced. (7) The number of prosecutions to be expected is another factor of some importance. The fewer the expected prosecutions, the more likely the legislature meant to require the prosecuting officials to impose liability without regard to fault. All the above factors have a bearing on the interpretation of the empty statute, but no single factor can be said to be controlling.

Wayne R. LaFave, 2 *Substantive Criminal Law* (2d ed.) § 5.5 at 381–86 (emphases added; footnotes omitted).

In other words, a strict liability offense has historically been one that was established by

a statute that was silent as to the state of mind required for commission of the offense.

### 2. *The Pre–HPC Case Law on Strict Liability Offenses*

Prior to the adoption of the HPC, the Hawai'i Supreme Court "recognized absolute criminal liability" for offenses that did not include a requisite state of mind. *See Commentary on HRS* § 702–212 (citing *Territory v. Yamamoto*, 39 Haw. 556 (1952)).

In *Yamamoto*, three defendants were separately charged with violating Revised Laws of Hawaii 1945 § 11192 [14] on April 29, 1946

for having in their possession a flag or flags "of the Empire of Japan, a nation in which the United States is at war, and during a time of the existence of war between the United States and Japan; without having a written permit from the Secretary of Hawaii for possession of such flag(s) in accordance with the rules and regulations promulgated thereunder by the Governor of the Territory of Hawaii, contrary to law."

*Id.* at 557. The defendants were found guilty as charged and sentenced to pay a fine and serve either a prison or probation term. *Id.*

On appeal, the defendants, relying on a presidential proclamation issued on August 16, 1945 that declared that the "War Lords of Japan and the Japanese armed forces have surrendered ... unconditionally," contended that no state of war existed between the United States and the Empire of Japan at the time of the charges, as required by the terms of the statute. *Id.* at 562. Rejecting this argument, the Hawai'i Supreme Court held that the war did not terminate until December 31, 1946, when President Harry S. Truman signed a proclamation of peace declaring that "hostilities have terminated." *Id.* at 562–63. The supreme court then found "section 11192 clear and unambiguous, and its provisions expressly prohibiting any person from having unlawful possession of a flag of any nation with which the United States is at war." *Id.* at 564. Additionally, the supreme court held that the possessing-an-enemy-flag-without-a-permit offense was a valid strict liability offense:

We find that the section, dealing as it does directly with the public welfare, safety, and security during periods of war, is designed not only to serve to protect and minimize occasions of public disturbances but also to protect the individual citizenry from possible public ire, anger, indignation or physical harm resulting from bare possession of a flag of an enemy nation during those periods.

The Supreme Court of the United States in *Shelvin–Carpenter Co. v. Minnesota*, 218 U.S. 57, 58[, 30 S.Ct. 663, 54 L.Ed. 930 (1910) ], states the applicable principle: "*The mere fact that a state police statute punishes an offense actually committed without regard to intent does not render the statute unconstitutional under the due process clause of the Fourteenth Amendment.*" In the lower court's decision of that case it was held that statutes which do not require intent are analogous "to the statutes prohibiting the sale of liquor to minors, in constructing which the courts uniformly hold that the honest belief of the person making the sale that the minor was of age is no defense; and to statutes prohibiting the sale of adulterated foods, where it is held that persons selling articles of food must know at their peril whether they are adulterated." ...

---

**14.** Revised Laws of Hawaii (RLH) 1945 § 11192 provided:

**Unlawful possession of flag, etc.; penalty.** Any person who, during the existence of war between the United States and any other nation, shall have unlawfully in his [or her] possession any flag, standard, color, ensign or coat-of-arms of any nation with which the United States is at war, or that of any state, subdivision, city or municipality of any such nation, shall be deemed guilty of a misdemeanor and shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or by both fine and imprisonment. The governor shall promulgate rules and regulations relating to the possession of any flag, standard, color, ensign, or coat-of-arms of any nation with which the United States is at war, or that of any state, subdivision, city or municipality of any such nation, which rules and regulations when published three times in a newspaper of general circulation in the Territory shall have the force and effect of law.

RLH 1945 § 11192 at 1460.

*The statute thus makes possession of the prohibited flags prima facie unlawful,* subject to the governor promulgating regulations upon specific lawful possession.

*Yamamoto,* 39 Haw. at 565–66 (emphases added).

The *Yamamoto* court also rejected the defendants' contention that the prosecution had failed to allege and prove that the defendants did not fall within an exception contained in the statute. The supreme court held that "[i]t was not the province of the Territory to allege and prove that the defendants were not within the exception. The burden of proof of affirmative defenses was upon the defendants[.]" *Id.* at 567 (citations omitted).

Under pre-HPC case law, therefore, a statutory offense lacking a specified state of mind was regarded as a strict liability offense, and the burden of proving the existence of any affirmative defenses rested on the defendant.

### 3. *The HPC's Treatment of Strict Liability Offenses*

In 1972, the Hawai'i legislature enacted the HPC, which became effective on January 1, 1973. 1972 Haw. Sess. L. Act 9, § 3 at 142. The HPC, which was based on the Model Penal Code (MPC), includes several provisions that reflect a legislative policy to limit strict liability *crimes.*

█ First, HRS § 702–204 provides that "*[e]xcept as provided in HRS § 702–212,*" a default "intentional, knowing, or reckless" state of mind applies to the elements of any offense that are not specified by law:

> **State of mind required.** Except as provided in section 702–212, a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense. When the state of mind required to estab-

lish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly.

The Commentary [15] on HRS § 702–204 notes:

> This section commences the [HPC's] consideration of the mental aspect or state of mind which will, in most instances, be required for the imposition of *penal* liability. *It must, of course, be read* in conjunction with the following section defining "element" of an offense and *in conjunction with § 702–212 which provides for those relatively few instances when absolute or strict penal liability will be recognized.*
>
> . . . .
>
> The distinct punitive nature of the penal law dictates that its sanctions be reserved for those individuals who can be morally condemned. The penal law does not, in most instances, condemn a person's conduct alone. Rather, it condemns the individual whose state of mind with regard to the individual's conduct, attendant circumstances, and the result of the individual's conduct, exhibits an intent to harm, an indifference to harming, or a gross deviation from reasonable care for protection of social values. Thus, *we have limited penal liability to those individuals who act intentionally, knowingly, recklessly, or negligently contrary to values protected by the [HPC].*

(Emphases added.) Thus, as a general rule, for *criminal* liability to exist under the HPC, a culpable state of mind must be established for the offense beyond a reasonable doubt. If the requisite state of mind is not specified in an offense defined by the HPC, the default "intentional, knowing, or reckless" state of mind applies.

Second, HRS § 702–212, which is based on MPC §§ 2.05(1)(a) and (1)(b),[16] sets forth

---

**15.** Pursuant to HRS § 701–105 (1993), "[t]he commentary accompanying this [HPC] shall be published and may be used as an aid in understanding the provisions of this [HPC], but not as evidence of legislative intent."

**16.** Model Penal Code (MPC) § 2.05(1) provides as follows:

> **When Culpability Requirements Are Inapplicable to Violations and to Offenses Defined by Other Statutes; Effect of Absolute Liability in Reducing Grade of Offense to Violation.**
>
> (1) The requirements of culpability prescribed by Sections 2.01 and 2.02 do not apply to:

those situations in which the state-of-mind requirements prescribed by HRS § 702–204 and HRS §§ 702–207 (1993) through 702–211 (1993) [17] are inapplicable:

> **When state of mind requirements are inapplicable to violations and to crimes defined by statutes other than this [HPC].** The state of mind requirements prescribed by sections 702–204 and 702–207 through 702–211 do not apply to:
>
> (1) An offense which constitutes a violation, unless the state of mind requirement involved is included in the definition of the violation or a legislative purpose to impose such a requirement plainly appears; or
>
> (2) *A crime defined by statute other than this [HPC], insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears.*

(Emphasis added.) The Commentary on the foregoing section explains the purpose of the section as follows:

> (a) offenses that constitute violations, unless the requirement involved is included in the definition of the offense or <u>the Court determines that its application is consistent with effective enforcement of the law defining the offense</u>; or
> (b) offenses defined by statutes other than the [MPC], insofar as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears.

(Emphasis added.) The underscored language above was replaced in the HPC by the following alternative: "a legislative purpose to impose such requirement plainly appears[.]" Therefore, unlike the MPC, which requires courts to determine whether culpability must be proved for violations, the HPC provides that culpability does not need to be proved for violations unless the legislature has plainly indicated that a culpable state of mind is applicable to the violation.

17. HRS §§ 702–207 through 702–211 provide as follows:
§ **702–207 Specified state of mind applies to all elements.** When the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears.
§ **702–208 Substitutes for negligence, recklessness, and knowledge.** When the law provides that negligence is sufficient to establish

This section provides for those instances when the culpability provisions of §§ 702–204 and 207 through 211 are not applicable.

Subsection (1) provides that the requirements of culpability are not generally applicable to violations. (Violations are the lowest grade of penal offenses and for which conviction can only result, according to § 701–107 and Chapter 706 in a fine, forfeiture or other "civil" penalty.) An exception is made in two cases: (1) for violations which by definition require culpable commission; and (2) for violations with respect to which a legislative purpose to impose one or more culpability requirements plainly appears. Subsection (1) applies whether the violation is defined in the [HPC] or in some other Title.

The assumption is that, with respect to violations, if culpable commission is required, the relevant state of mind will be stated in the definition of the violation whether the offense appears in the [HPC] or in some other statute. If the law is

an element of an offense, that element is also established if, with respect thereto, a person acts intentionally, knowingly, or recklessly. When the law provides that recklessness is sufficient to establish an element of an offense, that element also is established if, with respect thereto, a person acts intentionally or knowingly. When the law provides that acting knowingly is sufficient to establish an element of an offense, that element also is established if, with respect thereto, a person acts intentionally.
§ **702–209 Conditional intent.** When a particular intent is necessary to establish an element of an offense, it is immaterial that such intent was conditional unless the condition negatives the harm or evil sought to be prevented by the law prohibiting the offense.
§ **702–210 Requirement of wilfulness satisfied by acting knowingly.** A requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the elements of the offense, unless a purpose to impose further requirements appears.
§ **702–211 State of mind as determinant of grade or class of a particular offense.** When the grade or class of a particular offense depends on whether it is committed intentionally, knowingly, recklessly, or negligently, its grade or class shall be the lowest for which the determinative state of mind is established with respect to any element of the offense.

silent, the court must make an affirmative determination that the application of state of mind requirements with respect to the violation is within the Legislature's purpose.[18] In the absence of such a determination the liability is absolute or strict.

Subsection (2) provides for an extremely limited situation. *The [HPC] takes the general position that absolute or strict liability in the penal law is indefensible in principle if conviction results in the possibility of imprisonment and condemnation. Therefore, within the immediate context of the [HPC], criminal liability must be based on culpability.* However, it is recognized that the scope of the [HPC] is finite. *In other codes or Titles penal statutes exist which prima facie impose absolute criminal liability.*[1] *Subsection (2) allows for the imposition of such criminal liability in the case of crimes defined by statutes other than the [HPC]—when and only when—"a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears."* That such a purpose should not be discerned lightly by the courts seems

very clear." [2] Often regulatory penal statutes are absolute on their face when it is doubtful that absolute criminal liability was intended.[3] The limited recognition which subsection (2) affords absolute criminal liability is more of a limitation than a recognition, and within the context of the [HPC] this limitation is as far as the [HPC] can wisely go in imposing its standards on the spectrum of penal regulations.

Prior Hawaii law recognized absolute criminal liability.[4] *The effect of subsection (1) is to withdraw the criminal sanction (imprisonment or its equivalent) when liability is imposed absolutely within the [HPC]. Subsection (2) severely limits the situations which will allow the imposition of absolute criminal liability by statutes outside of the [HPC].*

1. See, e.g., [HRS] § 453–14 [19] (reporting knife, bullet and other wounds within twenty-four hours).

2. [MPC], Tentative Draft No. 4, comments at 145 (1955).

3. Compare [HRS] §§ 403–141, 403–142, and 403–147 with [HRS] § 403–146 (relating to the regulation of banks). [20]

(Emphases added.)

18. As noted in footnote 16 above, the HPC replaced the MPC § 2.05(1)(a) provision that courts determine whether culpability must be proved for violations.

19. At the time the HPC was enacted, HRS § 453–14 (1968) provided, in relevant part, as follows:

> **Duty of physician, surgeon, hospital, clinic, etc. to report wounds.** Every physician and surgeon attending or treating a case of knife wound, bullet wound, gunshot wound, powder burn, or any injury that would seriously maim, produce death, or has rendered the injured person unconscious, caused by the use of violence or sustained in a suspicious or unusual manner, or, whenever such case is treated in a hospital, clinic or other institution, the manager, superintendent, or person in charge thereof, *shall report such case to the chief of police of the county within which the person was attended or treated, giving the name of the injured person, description of the nature, type, and extent of the injury, together with other pertinent information which may be of use to the chief of police. . . .*
>
> . . . .
>
> *Any person who fails to make the report called for herein within twenty-four hours after such attendance or treatment shall be fined not less than $50 nor more than $500.*

20. At the time the HPC was enacted, HRS §§ 403–141 (1968), 403–142 (1968), 403–146 (1968), and 403–147 (1968) provided, in relevant part, as follows:

> **§ 403–141 False statements or entries; penalty.** Any officer, director, or employee of a bank who *wilfully or knowingly* subscribes to or makes or causes to be made any false statement or report to the director of regulatory agencies, or any false entry in the books or accounts of the bank; or who *knowingly* subscribes to or exhibits false papers *with the intent to deceive* any person authorized to examine into the affairs of the bank or its directors; or who *knowingly* states or publishes any false report or statement of the bank or prepares any false minutes, *with intent to deceive* any examiner or any person authorized to examine the affairs of the bank or the directors thereof; or who fails to make proper entry upon the books or records of the bank; to disclose the true condition of the bank; or who makes any entry upon the books or records of the bank *with intent to deceive or conceal the true condition thereof;* shall be fined not more than $1,000 or imprisoned not more than two years, or both.
>
> **§ 403–142 False entries on books or reports; penalty.** Any officer, director, employ-

4. *Territory v. Yamamoto*, 39 Haw. 556 (1952) (possession of enemy flag during wartime).

(Emphases and footnotes added.) We note that the offenses mentioned in the footnotes to the foregoing Commentary as imposing strict liability are empty of words denoting fault. Thus, the legislature recognized that strict liability offenses in existence at the time the HPC was enacted were generally silent as to any requisite state of mind.

Third, HRS § 702–213, which is based on MPC §§ 2.05(2)(a) and (2)(b),[21] states:

**Effect of absolute liability in reducing grade of offense to violation.** *Notwithstanding any other provisions of existing law* and unless a subsequent statute otherwise provides:

(1) *When absolute liability is imposed with respect to any element of an offense defined by a statute other than this [HPC] and a conviction is based upon such liability, the offense constitutes a violation except as provided in section 702–212(2);* and

(2) Although absolute liability is imposed by law with respect to one or more of the elements of an offense defined by a statute other than this [HPC] the culpable commission of the offense may be charged and proved, in which event negligence with respect to such elements constitutes a sufficient state of mind and the classification of the offense and the sentence that may be imposed therefor upon conviction are determined by section 701–107 and chapter 706.

(Emphases added.)

The Commentary on HRS § 702–213 explains how the foregoing section relates to HRS § 702–212:

$1,000 or imprisoned not more than five years, or both.

. . . .

(Emphases added.) Although the foregoing statutory provisions all related to the regulation of banks and were included in the "Crimes and Penalties" part of HRS chapter 403, three of the statutes included requisite states of mind, but HRS § 403–146 was silent as to any state of mind.

21. MPC § 2.05(2)(a) and (b) state as follows:

(2) Notwithstanding any other provision of existing law and unless a subsequent statute otherwise provides:

(a) when absolute liability is imposed with respect to any material element of an offense defined by a statute other than the [MPC] and a conviction is based upon such liability, the offense constitutes a violation; and

(b) although absolute liability is imposed by law with respect to one or more of the material elements of an offense defined by a statute other than the [MPC], the culpable commission of the offense may be charged and proved, in which event negligence with respect to such elements constitutes sufficient culpability and the classification of the offense and the sentence that may be imposed therefor upon conviction are determined by Section 1.04 and Article 6 of the [MPC].

The only material difference between MPC § 2.05(2) and HRS § 702–213 (1993) is that in HRS § 702–213, the proviso "except as provided in section 702–212(2)" appears after the phrase "the offense constitutes a violation" at the end of subsection (1).

---

ee, or agent of a bank who makes a false or misleading entry or *wilfully* omits to make entry in any book, report, or statement of the business, affairs, or condition, in whole or in part, of the bank, with respect to any matter particularly pertaining to the business with intent to deceive or conceal the true condition of the business from any officer, director, or any agent, examiner, or other person employed or lawfully appointed to examine into the condition of any of its affairs, or any public officer, office, or board to whom or which the bank is required by law to report, or having authority by law to examine into any of its affairs, or who, *with like intent*, causes, aids, or abets any other person to make any false entry or to fail to make a requisite entry, shall be fined not more than $1,000 or imprisoned not more than two years, or both.

**§ 403–146 Illegal guaranty or indorsement; penalty.** Any officer, director, or agent of a bank who makes or delivers any guaranty or indorsement on behalf of the bank whereby it may become liable upon any of its discounted notes, bills, or obligations, in any sum beyond the amount of loans and discounts which the bank may legally make, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**§ 403–147 Fraudulent insolvency; penalty.** Any officer or director of a bank who, in case of the fraudulent insolvency of the bank, has participated in the fraud, or any officer or director who *wilfully* does any act, as such officer or director, which is expressly forbidden by law, or *wilfully* omits to perform any duty imposed upon him as such officer or director by law, shall be fined not more than

As explained in prior commentary, the [HPC] takes the position that penal law is primarily concerned with the culpable commission of offenses. *Absent a minimal degree of culpability—i.e., negligence as defined in the [HPC]—the penal law should not impose sanctions (e.g., imprisonment) which import moral condemnation.* In such situations "the law has neither a deterrent nor corrective nor an incapacitative function to perform." Accordingly, § 702-204 requires, *subject to § 702-212,* culpability with respect to the elements of penal offenses. *Section 702-212 provides that the culpability provisions are not applicable to violations—the lowest grade of penal offenses—which result in a fine, forfeiture or other "civil" penalty, but not in imprisonment or its equivalent.* Because of the limited scope of the [HPC] and *because of the pervasive use of penal sanction in regulatory statutes, § 702-212 also provides that the culpability requirements are not applicable to offenses defined by statutes other than the [HPC] when a legislative purpose to impose absolute liability plainly appears.*

*Section 702-213 is a necessary concomitant to § 702-212(2). It provides that, with the limited exception of § 702-212(2), when absolute liability is imposed by a statute other than the [HPC], the offense shall constitute a violation and not a crime.*

Subsection (1) of this section thus superimposes, as far as possible, the standards of the [HPC] to all penal statutes.

*Subsection (2) provides, on the other hand, that, with respect to penal statutes outside the [HPC], although absolute liability is imposed, reducing the offenses to the status of a violation, the culpable commission of such offenses may be charged and proved. In such cases, the reduction of the offense to a violation does not occur.* Negligence is treated as sufficient culpability in cases of this kind. Since most penal statutes which are not a part of the [HPC] are regulatory legislation, providing that a criminal conviction may be based on negligence does not seem overly severe given the aims of such legislation.

(Emphases added, footnote omitted.)

Finally, we note that pursuant to HRS § 701-107(5) (1993), a "violation" is defined, for purposes of the HPC, as follows:

An offense defined by this [HPC] or any other statute of this State constitutes a violation if it is so designated in this [HPC] or in the law defining the offense or if no other sentence than a fine, or fine and forfeiture or other civil penalty, is authorized upon conviction or if it is defined by a statute other than this [HPC] which provides that the offense shall not constitute a crime. A violation does not constitute a crime, and conviction of a violation shall not give rise to any civil disability based on conviction of a criminal offense.

The Comment on MPC § 1.04(5),[22] which HRS § 701-107(5) was modeled after, explains the role of violations in the MPC structure for grading and classifying offenses:

Subsection (5) establishes a noncriminal class of offense, denominated "violations," for which only a fine or other civil penalty is authorized, excluding both probation and imprisonment. In addition to criminal offenses, there is need for a public sanction calculated to secure compliance in situations where it would be impolitic or unjust to condemn the conduct involved as criminal; for example, in the case of a traffic violation. A category of offenses that are not "crimes" and for which the sentence authorized upon conviction is limited to a fine or fine and forfeiture or other civil penalty, such as the cancellation or suspension of a license, serves the legitimate needs of enforcement and reflects the posi-

---

**22.** MPC § 1.04(5) states:

An offense defined by this [MPC] or by any other statute of this State constitutes a violation if it is so designated in this [MPC] or in the law defining the offense or if no other sentence than a fine, or fine and forfeiture or other civil penalty is authorized upon convic-tion or if it is defined by a statute other than this [MPC] that now provides that the offense shall not constitute a crime. A violation does not constitute a crime and conviction of a violation shall not give rise to any disability or legal disadvantage based on conviction of a criminal offense.

tion of the [MPC] that penal sanctions are justified only with respect to conduct warranting the moral condemnation implicit in the concept of a crime. *The violation class was also thought to be the appropriate means for dealing with the problem of strict liability, a phenomenon of such pervasive scope in modern regulatory legislation. As explained in the Comment to Section 2.05, it was the judgment of the [American Law] Institute that when absolute liability applies to any material element of an offense, the offense should not be called a crime nor the offender subject to imprisonment.*

Most of the revised and proposed codes include a noncriminal class of offense, variously denominated as violation, infraction or petty offense, for which no imprisonment may be imposed.[12] Some provide that certain offenses shall not constitute crimes, but authorize imprisonment as a possible sanction. This approach was rejected by the Institute in the view that imprisonment ought not to be available as a punitive sanction, unless the conduct that gives rise to it warrants the type of social condemnation that is and ought to be implicit in the concept of "crime." [14]

12. *See* ... [HRS] § 701–107(5) ("Violation")[.]

14. "To make a practice of branding people as criminals who are without moral fault tends to weaken respect for law and the social condemnation of those who break it." G. Williams, Criminal Law: The General Part 259 (2d ed.1961). *See* Conway, *Is Criminal or Civil Procedure Proper for Enforcement of Traffic Laws?*, 1959 Wis. L.Rev. 418; 1960 Wis. L.Rev. 3.
(Emphasis added, footnotes 10, 11, and 13 omitted.)

■■■ Construing HRS §§ 701–107(5), 702–204, 702–212, and 702–213 together in light of the history and prior case law on strict liability offenses, it becomes apparent that the legislature, in enacting the HPC, established a structural framework for grading and classifying offenses defined by statutes empty of a culpable state of mind that sought to limit absolute liability crimes. Under this structural framework:

- Strict liability crimes are generally disfavored, and consequently, if an HPC statute or a subsequently enacted statute outside the HPC establishes an offense punishable by imprisonment but silent as to the requisite state of mind, the default intentional, knowing, or reckless state of mind set forth in HRS § 702–204 applies to the offense.

- Strict liability *crimes* punishable by imprisonment that existed at the time the HPC was enacted and are defined by a statute other than the HPC are allowed, but if, and only if, it plainly appears that the legislative body enacting the statute intended to impose strict or absolute liability for such offense or with respect to any element thereof; these crimes do not require proof of a culpable state of mind for conviction.

- Strict liability offenses punishable by imprisonment that existed at the time the HPC was enacted and are defined by a statute other than the HPC for which no plainly appearing legislative purpose to impose absolute liability exists, are automatically decriminalized and converted to civil violations; however, these same offenses may be charged as crimes punishable by imprisonment if a negligent state of mind is alleged and proved as to the elements of the charged offense.

■■ Stated otherwise, under the HPC framework established by the legislature, it is not necessary to prove that a defendant acted with a culpable state of mind for the following categories of offenses:

- Offenses that constitute violations punishable by "no other sentence than a fine, or fine and forfeiture or other civil penalty," HRS § 701–107(5), except when the statute establishing the offense expressly sets forth a state-of-mind requirement;

- Offenses in existence at the time the HPC was enacted that are punishable by imprisonment, defined by a statute outside the HPC, and "in which a legislative purpose to impose absolute liability for such offense(s) or with respect to an element plainly appears[;]" and

- Offenses in existence at the time the HPC was enacted that are punishable by imprisonment, defined by a statute outside the HPC, and empty of a state of mind, which, by virtue of HRS § 702–213, are reduced to a violation punishable by fine, forfeiture, or civil penalty only; however, these same offenses may be charged as crimes punishable by imprisonment if a negligent state of mind is alleged and proved as to the elements of the offense.

The foregoing structural framework maintains the logical structure of the HPC and implements the goal of the HPC "to bring uniformity to the area of non-[HPC] statutory offenses." Commentary on HRS § 701–102 (1993).[23] Consistent with the HPC's frontal attack on strict liability *crimes*, HRS § 702–213 reduces the vast majority of non-HPC strict liability offenses punishable by imprisonment existing at the time the HPC was enacted to violations punishable by fine, forfeiture, or civil penalty only. At the same time, the HPC framework preserves to the legislature, the county councils, and other political subdivisions established by the legislature the option of criminalizing strict liability offenses established by statutes outside the HPC by clearly indicating a purpose to do so. The HPC framework also preserves to county prosecutors the option of charging pre-HPC strict liability offenses as crimes, subject to proof of negligence as the requisite mental state.

We take judicial notice that there are many offenses defined by statutes outside the HPC that are empty of a state of mind, are subject to a sentence of imprisonment, and were, according to the historical source notes for the offenses, in existence at the time the HPC was enacted. *See, e.g.,* HRS §§ 142–93 (1993) and 142–12 (1993) (first conviction for harboring, feeding, or caring for a mongoose without a permit is punishable by imprisonment of not more than one year); HRS § 142–95 (1993) (failure to breed, raise, or keep rabbits or Belgian hares off the ground punishable by imprisonment of not more than six months); ROH §§ 16–8.2 (1990 & Supp.2006) and 16–8.5 (1990 & Supp.2006) (possession of termite-or bore-infested lumber punishable by imprisonment for a term not exceeding twelve months); ROH §§ 10–1.2(a)(2) (1990 & Supp.2006) and 10–1.6(d) (1990 & Supp.2006) (climbing onto a tree, except one designated for climbing, within limits of any public park punishable by imprisonment for not more than thirty days); ROH § 7–4.9 (owner of a dog which has become a stray, i.e., running at large, within two years of occurrence of two or more previous offenses, shall be punished by "imprisonment not exceeding 30 days"); Hawaii County Code (HCC) §§ 15–26 (Republ. June 2005) and 15–7 (Republ. June 2005) (parking within county park area not designated for public parking punishable "by imprisonment not to exceed ninety days"); HCC §§ 15–31 (Republ. June 2005) and 15–7 (using roller skates or skateboard, except in locations designated by posted signs, punishable "by imprisonment not to exceed ninety days").

We also recognize that applying the default state of mind set forth in HRS § 702–204 to pre-HPC offenses such as the foregoing, rather than reducing such offenses to a violation pursuant to HRS § 702–213(1), has a substantial impact on the Hawai'i criminal justice system. For example, pursuant to article I, section 14 of the Hawai'i Constitution[24] and HRS § 802–1 (1993),[25] an individu-

---

**23.** HRS § 701–102 (1993) provides:

**All offenses defined by statute; applicability to offenses committed after the effective date.** (1) No behavior constitutes an offense unless it is a crime or violation under this [HPC] or another statute of this State.

. . . .

(3) The provisions of chapters 701 through 706 of the [HPC] are applicable to offenses defined by other statutes, unless the [HPC] otherwise provides.

**24.** Article I, section 14 of the Hawai'i Constitution provides, in relevant part: "The State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment."

**25.** HRS § 802–1 (1993) provides, in pertinent part: "Any indigent person who is (1) arrested for, charged with or convicted of an offense or offenses punishable by confinement in jail or prison . . . shall be entitled to be represented by a public defender. If, however, conflicting interests exist, or if the public defender for any other reason is unable to act, or if the interests of

al charged with an offense punishable by imprisonment is entitled to court-appointed counsel. *See State v. Dowler,* 80 Hawai'i 246, 249, 909 P.2d 574, 577 (App.1995). Additionally, a person charged with an offense punishable by imprisonment may be entitled to a trial by jury,[26] and a determination that a person committed an absolute liability crime may be reflected on a person's criminal record.

### 4. *The Camping–Without–a–Permit Offense Is Presumptively a Strict Liability Violation*

■ In this case, the Camping Ordinance at issue is silent as to a requisite state of mind for commission of the camping-without-a-permit offense. Since the Camping Ordinance preexisted and is outside the HPC, it is a strict liability offense, and the default state of mind set forth in HRS § 702–204 is not applicable. To determine whether the offense is a strict liability *crime,* we must evaluate whether "a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears."

The Hawai'i Supreme Court has held that evidence of a plainly appearing legislative purpose to impose absolute liability for an offense includes: express statutory language imposing absolute liability, *State v. Eastman,* 81 Hawai'i 131, 140, 913 P.2d 57, 66 (1996); legislative history that leaves no doubt that the legislature did not intend a state of mind to apply to an element of an offense, *State v. Buch,* 83 Hawai'i 308, 316–17, 926 P.2d 599, 607–08 (1996); and elimination of a previous

state-of-mind requirement from an offense. *Id.* at 315, 926 P.2d at 606.

We have uncovered no evidence of a plainly appearing legislative purpose to impose absolute liability for the camping-without-a-permit offense defined by the Camping Ordinance. Therefore, we conclude that pursuant to HRS § 702–213(1), the camping-without-a-permit offense was reduced to a violation punishable by fine, forfeiture, or other civil penalty unless Appellants were specifically charged pursuant to HRS § 702–213(2) with committing the offense with a negligent state of mind.

### C. *Whether the Camping Ordinance Is Unconstitutionally Vague*

■ Appellants allege that the Camping Ordinance is unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution[27] and article I, section 5 of the Hawai'i Constitution[28] because the term "camping" is not defined. They allege that the terms used in the definition of "camping" lack precision, are amorphous, and are dependent on subjective interpretation. Lucas argues, for example, that

[a] substantial number of people who utilize the parks, regularly engage in the types of activities enumerated in the rule without a second thought. Whether people are at soccer games, baseball games or at beach parks, they normally pitch tents, lay down tarps for resting and almost always barbecue some kind of food. Technically, under the rule, every person that engages in these listed activities is guilty

---

justice require, the court may appoint other counsel."

**26.** There is no bright line rule under existing Hawai'i case law for determining when the right to a jury trial exists for criminal cases. In *State v. Lindsey,* 77 Hawai'i 162, 165, 883 P.2d 83, 86 (1994), the Hawai'i Supreme Court held that "if the maximum authorized term of a particular offense does not exceed thirty days, it is presumptively a petty offense to which the right to a jury trial does not attach." However, the *Lindsey* court cautioned in footnote 5 that "[t]his is not to say that the right to a jury trial presumptively attaches if maximum term exceeds 30 days." *Id.*

**27.** The Fourteenth Amendment to the United States Constitution states, in relevant part:

**Section 1.** ... [N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**28.** Article I, section 5 of the Hawai'i Constitution states, in pertinent part:

**DUE PROCESS AND EQUAL PROTECTION**
**Section 5.** No person shall be deprived of life, liberty or property without due process of law[.]

of some form of camping. How is someone to know when they have crossed the line between having a family outing and camping? Unfortunately, under the present rule, it isn't clear what that line is.

The Hawai'i Supreme Court has stated that claims that a criminal statute [29] is unconstitutionally vague "are treated essentially as facial attacks," *State v. Bates,* 84 Hawai'i 211, 220, 933 P.2d 48, 57 (1997), subject to the following standard:

> Due process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudicating guilt, or the statute is void for vagueness. Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.

*Id.* Under this standard, which "is essentially indistinguishable from the applicable standard under federal law,"

> a criminal statute is void for vagueness unless it: 1) gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he or she may act accordingly, and 2) provides explicit standards for those who apply the statute, in order to avoid arbitrary and discriminatory enforcement and the delegation of basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.

*Id.* at 220–21, 933 P.2d at 57–58.

Applying the foregoing standard to this case, we initially observe that although the Camping Ordinance did not define "camping," Camping Rule § 3(5), which the Director was authorized to promulgate, defined "camping" as follows:

> "Camping" means the use of public park for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.

The foregoing definition is almost identical to one contained in a National Park Service regulation that was upheld by the United States Supreme Court in *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), as a reasonable time, place, and manner restriction on conduct. The issue in *Clark* was whether a regulation prohibiting camping in certain parks violated the First Amendment when it was applied to prohibit demonstrators from sleeping overnight in two parks in the heart of Washington, D.C., in connection

---

29. As discussed previously, unless Appellants were charged with violating the Camping Ordinance with a negligent state of mind, HRS § 702–213 would convert the camping-without-a-permit offense to a civil violation. The United States Supreme Court has declared that the standards for evaluating vagueness

> should not ... be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. *The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.*

> *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (emphasis added, footnotes omitted).

> In this case, if Appellants were charged with committing the camping-without-a-permit offense as a violation, the consequences of any imprecision of the Camping Ordinance and the Amended Camping Policy, Rules and Regulations Governing Camping at City Parks are not severe and any vagueness challenge they make would be meritless.

with a demonstration intended to call attention to the homeless. *Id.* at 289, 104 S.Ct. 3065.

Under the regulations involved in *Clark*, camping in national parks was permitted only in designated campgrounds, and neither park that the demonstrators wanted to sleep in had been so designated. In upholding the regulation, the United States Supreme Court noted that

> the regulation narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence. To permit camping—using these areas as living accommodations—would be totally inimical to these purposes, as would be readily understood by those who have frequented the National Parks across the country and observed the unfortunate consequences of the activities of those who refuse to confine their camping to designated areas.

*Id.* at 296, 104 S.Ct. 3065.

In *People v. Scott*, 20 Cal.App.4th Supp. 5, 26 Cal.Rptr.2d 179 (1993), a California appellate court upheld the constitutionality of a definition of "camping" contained within a municipal ordinance that was similar to the one upheld in *Clark*, which was being challenged on vagueness grounds. West Hollywood Municipal Code § 4801 stated:

> Camping shall mean residing in or using a park for living accommodation purposes, as exemplified by remaining for prolonged or repetitious periods of time not associated with ordinary recreational use of a park with one's personal possessions (including but not limited to clothing, sleeping bags, bedrolls, blankets, sheets, luggage, backpacks, kitchen utensils, cookware, and similar material), sleeping or making preparations to sleep, storing personal belongings as above defined, regularly cooking or consuming meals, or living in a parked vehicle. These activities constitute camping when it reasonably appears, in light of all the circumstances, that a person(s) is using a park as a living accommodation regardless of their [sic] intent or the nature of any

other activities in which they might also be engaging.

*Scott*, 26 Cal.Rptr.2d at 180 n. 1 (quotation marks omitted). The California court held:

> The specific charge in this case is that the ordinance is unconstitutionally vague. To withstand a facial vagueness challenge under the due process clause, a statute must satisfy two basic requirements.

> First, a statute must be sufficiently definite to provide adequate notice of the conduct proscribed.... Second, a statute must provide sufficiently definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. Reasonable certainty is all that is required. A statute will not be held void for vagueness if any reasonable and practical construction can be given its language or if its terms may be made reasonably certain by reference to other definable sources.... All that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices....

> If the West Hollywood ordinance did not provide a definition of what conduct is to be considered camping, the ordinance might be considered unconstitutionally vague. However, even in that instance, we all have a common-sense understanding of what camping is, and the regulations aid that understanding by giving specific examples of activities that constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation....

> The list of examples of the West Hollywood ordinance provides fair notice to defendants as to what activities are to be considered indicia of camping. Thus, the ordinance is reasonably certain as to what conduct was prohibited.

> The ordinance also provides adequate guidelines for the police sufficient to prevent arbitrary enforcement of the ordinance. The ordinance requires that the person's prohibited conduct be exemplified by their "remaining for prolonged or repetitious periods of time not associated with ordinary recreational use of a park with

one's personal possessions" which include indicia of camping such as "sleeping bags, bedrolls, blankets, sheets, luggage, backpacks, kitchen utensils, cookware and similar material." Further, the ordinance requires that it must "reasonably appear, in light of all the circumstances, that a person is using the park as a living accommodation" before the person's activities constitute camping.

*Id.* at 182 (brackets, citations, and some quotation marks omitted).

We agree that most individuals have a common-sense understanding of what "camping" is. We also conclude that the definition of "camping" in Camping Rule § 3(5) provides sufficiently definite guidelines and examples to put a person of ordinary intelligence on fair notice of the types of activities that constitute reasonable indicia of camping. The definition also provides objective standards to law enforcement officials for determining what constitutes camping so as to prevent arbitrary enforcement of the Camping Ordinance. Therefore, the Camping Ordinance, in conjunction with the Camping Rules, is not unconstitutionally vague.

D. *Whether the Camping Ordinance and the Camping Rules Are Constitutionally Overbroad*

 "The doctrine of overbreadth, although closely related to a vagueness claim, is distinct in that while a statute may be clear and precise in its terms, it may sweep so broadly that constitutionally protected conduct as well as unprotected conduct is included in its proscriptions." *State v. Gaylord,* 78 Hawaiʻi 127, 142, 890 P.2d 1167, 1182 (1995) (quoting *State v. Kaneakua,* 61 Haw. 136, 143, 597 P.2d 590, 594 (1979) (quotation marks omitted)).

Lucas contends that the definition of "camping" in the Camping Rules is overly broad because

it would virtually encompass all of the types of activities that any individual or group of people would engage in whether at a beach park or a district park, including setting up of tents, laying down tarps, or even cooking on a barbecue. These are

protected types of activities that people are allowed to do at parks.

Beltran argues that the Camping Ordinance, in conjunction with the Camping Rules, is unconstitutionally overbroad because "it places an unlimited and sweeping infringement on the exercise of the freedoms of movement and association which are part of the liberties guaranteed by the due process clauses of the federal and Hawaii state constitutions." Specifically, according to Beltran,

[t]he [C]amping [O]rdinance outlaws numerous such constitutionally protected activities which are commonly enjoyed in Hawaii's parks, particularly the beach parks, without a permit. It is part of the lifestyle of Hawaii's residents to spend the day at the beach socializing with friends and family, picnicking, barbequing, sunbathing, enjoying the ocean and beach. It is common to see people at Ala Moana beach park or Waimanalo beach park involved in these pursuits with the use of tents, wind-breaks, lean-tos, cots, sleeping mats, sleeping bags, blankets, hibachis, bonfires, portable gas stoves, pots, pans, plates, eating utensils, without first obtaining a permit. All of these activities fall within the ordinance's specific definitions of prohibited "camping", i.e. "use of public park for living accommodation purposes."

We observe, however, that the Camping Ordinance and the Camping Rules do not prohibit the activities that Appellants claim are constitutionally protected. They merely require that a permit be obtained to engage in these activities. Thus, we need not address whether the activities cited by Appellants are constitutionally protected.

 In addition, it is well-settled that "[o]ne who alleges that a statute is unconstitutionally overbroad, other than a statute affecting the freedom of expression, must be directly affected by the claimed overbroad aspects." *Id.* at 142, 890 P.2d at 1182 (quoting *State v. Tripp,* 71 Haw. 479, 483, 795 P.2d 280, 282 (1990) (quotation marks omitted)). "A person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally to others." *State*

*v. Sturch,* 82 Hawai'i 269, 274, 921 P.2d 1170, 1175 (App.1996) (quoting *Kaneakua,* 61 Haw. at 144, 597 P.2d at 594 (quotation marks omitted)); *see also State v. Adler,* 108 Hawai'i 169, 179, 118 P.3d 652, 662 (2005) (citing *State v. Bui,* 104 Hawai'i 462, 465, 92 P.3d 471, 474 (2004); *State v. Kane,* 87 Hawai'i 71, 77, 951 P.2d 934, 940 (1998)). Moreover, "every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt." *Kane,* 87 Hawai'i at 74, 951 P.2d at 937 (1998) (quoting *State v. Bates,* 84 Hawai'i 211, 220, 933 P.2d 48, 57 (1997)).

The record on appeal is absent of any facts surrounding the circumstances for Appellants' arrests. Consequently, we are unable to determine whether the Camping Ordinance and the Camping Rules, as applied to Appellants, implicated their constitutional rights. Appellants have therefore, failed to satisfy their burden of overcoming the presumption that the Camping Ordinance and the Camping Rules are constitutional.

## CONCLUSION

The record on appeal does not include any written charging complaints against Appellants or any transcripts of the arraignment hearings at which Appellants were orally charged. We are therefore, unable to determine whether the State charged them with camping without a permit with a negligent state of mind, a crime pursuant to HRS § 702–213(2), or camping without a permit with no state of mind specified, a violation pursuant to HRS § 702–213(1). We therefore, vacate the judgment against Keawemauhili entered on October 17, 2003, the judgment against Beltran entered on November 10, 2003, and the judgment against Lucas entered on November 10, 2003 and remand the cases to the district court to determine the classification of the offense with which Appellants were charged. If the charge against Appellants did not allege a negligent-state-of-mind element, the district court shall enter judgment against the respective Appellants for camping without a permit as a civil violation. If the charge included a negligent or higher state of mind, the district court

shall enter judgment against the respective Appellants for the criminal petty misdemeanor offense of camping without a permit.

